Raymond J. GORMAN, III

v.

UNIVERSITY OF RHODE ISLAND, Ronald Weisinger, Alias, in his individual and official capacity, A. Robert Rainville, Alias, in his individual and official capacity, and Edward Eddy, in his individual and official capacity, and Roger Begin, in his capacity as Treasurer of the State of R.I.

Civ. A. No. 85–0210 P.

United States District Court,
D. Rhode Island.

Oct. 14, 1986.

Marc B. Gursky, Providence, R.I., for plaintiff.

Nicholas Long, University of R.I., Kingston, R.I., for defendants.

### OPINION AND ORDER

PETTINE, Senior District Judge.[1]

In this action, the plaintiff, Raymond J. Gorman, III, seeks injunctive and compensatory relief under the Civil Rights Act, 42 U.S.C. §§ 1983, 1985 and 1988, for alleged violations of his constitutional rights to free speech and due process under the First and Fourteenth Amendments. The defendants in this action are the University of Rhode Island ("U.R.I.") and three of its employees, Ronald Weisinger, A. Robert Rainville, and Edward Eddy, in both their individual and official capacities, and Roger Begin, in his capacity as Treasurer of the State of Rhode Island. The plaintiff alleges that the defendants violated his constitutional rights through a series of three disciplinary hearings during the academic year 1984–1985, which resulted in both his being barred from holding office in any recognized student organization and his suspension for a year from U.R.I.

The Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 (1982) (federal question).

### I. Factual Background

Raymond Gorman enrolled as a student at U.R.I. in September 1981. During his second and third years at the University, he became active in student organizational activities and was elected to serve on the

---

**1.** The lengthiness of the opinion that follows might raise a question of judicial economy. It is hoped that the reader will indulge this Court's finding that considerations of economy were outweighed in this case by three other factors: first, the numerous conflicts among relevant precedents; second, the sensitivity of judicial challenges to the internal affairs of universities; and third, the great interest aroused by this case among an entire student body, some of whom, I hope, will find their way to the end of the opinion.

Student Senate. He served on the University's presidential search committee, and chaired the Student Senate's affirmative action committee and its student organizational and review committee. As frequently happens in student politics, some of the offices and viewpoints held by Gorman sparked controversy. Some students opposed Gorman's chairmanship of the Senate's affirmative action committee because of his status as a white male. Some students and staff opposed Gorman's Student Senate budget proposals, one of which successfully cut funding for a student entertainment committee, and another of which challenged a recommended salary increase for the Student Senate's paid secretary, Melanie Murphy.

In September of 1984, Gorman was involved in two incidents that gave rise to the disciplinary proceedings and sanctions which he challenges in this Court. On September 17, 1984, Gorman and the then-acting-director of the U.R.I. student union, Vera Carr, engaged in an argument based on conflicting claims over rights to take and use a student union van. On Sept. 19, Carr filed a complaint with the University charging Gorman with "Verbal abuse— Harassment," citing specific violations of U.R.I.'s *Student Rights and Responsibilities 1984—85 Handbook.*

On September 18, 1984, the day after the argument with Carr, Gorman and Student Senate Secretary Melanie Murphy engaged in an argument based on conflicting claims as to the proper handling of the keys to the student union van. Later that day, Murphy filed a complaint with the University charging Gorman with "verbal harassment and threats," citing specific violation of the University's handbook referred to above.

Over the next six months, there followed three separate disciplinary hearings before the University Board on Student Conduct ("UBSC"), stemming from (1) the charges filed by Vera Carr, (2) the charges filed by Melanie Murphy and (3) subsequent charges filed by Vice President for Student Affairs A. Robert Rainville, based upon Gorman's non-compliance with certain sanctions issued by the second (Murphy) hearing board. Throughout this series of hearings, the UBSC consisted of one Professor and, at different times, either four or five students. At all times, the Acting Director of Student Life, Ronald Weisinger, served as the UBSC advisor and participated in its meetings as a non-voting party.

1. The Carr Hearings

On October 4, 1984, a seven hour hearing on the Carr charges was held before the UBSC. By a 6–0 vote, the UBSC found Gorman guilty of "harassing and intimidating Vera Carr with verbal abuse," and by a 5–0–1 vote, found him guilty of "impeding her in the performance of her duties." The UBSC placed Gorman on disciplinary probation until April 4, 1985, and further required him to attend one counseling session at the University's counseling center by October 31, 1984. No appeal was taken from this decision. Gorman attended the required counseling session on November 5, 1984. The disciplinary probation sanction required Gorman to resign his Student Senate seat, which he did. The student Senate changed its constitution shortly thereafter, however, allowing students on probation to serve as Senators. Gorman then ran for his former Student Senate position, and was returned to office.

2. The Murphy Hearings

The hearing on the Murphy charge was convened on November 8, 1984. Gorman, through Rick Santurri, a fellow student allowed to advise Gorman, alleged bias on the part of two UBSC members: Roberto Pietersz, who had opposed Gorman's chairmanship of the Student Senate affirmative action committee; and chairperson Julia Emmets, who had allegedly expressed her dislike of "people who went against the system" in a previous conversation with Santurri. In a subsequent hearing session, Santurri also questioned UBSC advisor Weisinger about bias, alleging that Weisinger and the charging party Murphy were personal friends, but Weisinger refused to answer on that point.

After a seven hour session on November 8, 1984, the Murphy hearing was continued until November 28, 1984. Due to a temporary stay of the hearing ordered by the state court,[2] the hearing did not in fact resume until January 14, 1985. Following the conclusion of the hearing, the UBSC by a 5–0 vote found Gorman guilty of "verbally threatening and/or harassing Melanie Murphy." The UBSC issued two sanctions against Gorman. First, he was required within two weeks to undergo an evaluation with the University's consulting psychiatrist and, if recommended by the psychiatrist, to enter and complete a course of treatment as a condition of continued enrollment at U.R.I. Second, Gorman was immediately and permanently banned from serving as either a Student Senator, Senate committee member, or officer of any recognized student organization.

Gorman appealed this decision to the University Board of Judicial Appeals ("Appeals Board"). The Appeals Board consists of two professors and one student. It reviews, upon request, decisions of the UBSC. Its review is based upon a report of the UBSC's hearing and decision, prepared by the advisor to the UBSC, who in this case was defendant Weisinger. The Appeals Board approved the UBSC decision regarding Murphy's charges against Gorman.

### 3. The Rainville Hearing

Gorman failed to comply with the sanctions issued by the UBSC following the Murphy hearing. He participated in Student Senate meetings in his capacity as a Senator, violating sanction number two. He failed to obtain a psychiatric evaluation with the University's consulting psychiatrist, violating sanction number one. Defendant Rainville, U.R.I.'s Vice-President for Student Affairs, formally charged Gorman with violating these sanctions in a memorandum to defendant Weisinger on March 5, 1985.

A hearing on the Rainville charge was scheduled to be held on March 28, 1985 at 6 p.m. By a letter addressed to Weisinger, dated March 26, 1985, Gorman requested that he be permitted an open hearing, that a stenographer be provided at the University's expense, that he be given an opportunity to tape record the hearing, and that he be permitted to have legal counsel present. On March 27, 1985, Weisinger advised Gorman that he was entitled to make a stenographic record of the hearing at his own expense, provided he give written assurances that the University could obtain a copy.[3] He was also informed that he would not be permitted to have legal counsel represent him at the hearing.

The hearing was conducted as scheduled on March 28. The UBSC in this hearing included the same two student members whom Gorman had questioned as to bias in the Murphy hearing: Chairperson Julia Emmets, and Roberto Pietersz. By a 6–0 vote, Gorman was found guilty of violating the sanctions imposed by the Murphy hearing board. Three new sanctions were imposed. First, Gorman was immediately suspended from the University through August 31, 1986. The decision provided that the suspension would be stayed until the end of the Spring, 1985 semester, if Gorman met two conditions: resigning within twenty-four hours from all positions which he previously had been prohibited from holding, and obtaining within one week the previously-required psychiatric evaluation and undertaking any recommended course of treatment. The second sanction required "that the recommended suspension continue until Raymond fully

---

**2.** Gorman had instituted an action in state court to compel the University to permit the disciplinary hearing to be video taped. A temporary restraining order was granted on November 28, 1984, which stayed the hearing. At a hearing on December 13, 1984 the prior order was vacated and a preliminary injunction was denied.

**3.** In the original letter to Gorman, Weisinger stated that the University copy was also to be provided at Gorman's expense. U.R.I. asserts that it later verbally informed the plaintiff that the statement to that effect in the letter was a typographical error, and that the University would bear the expense of its own copy. Plaintiff denies this.

and completely complies with any and all sanctions which have been levied against him." The third sanction consisted of "Disciplinary Probation for the remainder of his undergraduate enrollment at the University." This decision was approved by defendant Edward Eddy, President of U.R.I., on April 2, 1985. On April 11, 1985, Gorman filed an appeal request, and on April 15, the University Appeals Board denied Gorman's appeal.

Plaintiff Gorman then instituted the present action. On April 16, 1985, he moved to enjoin the enforcement of the three sanctions described above. The Court issued a temporary restraining order, enjoining the defendants to allow the plaintiff to complete his Spring, 1985 semester schoolwork, absent a new incident giving rise to the right to suspend or expel him. *Gorman v. Eddy*, No. 85–0210 (D.R.I. April 17, 1985) (Selya, J.). The Court also ordered compliance with one of the conditions appended to the first sanction, namely, that the plaintiff refrain from serving as an officer of either the Student Senate or any recognized student organization. *Id.* This order expired on May 15, 1985, after the plaintiff completed his Spring semester examinations.

■ The plaintiff then moved for a preliminary injunction to enjoin the defendants from interfering with his attendance at U.R.I. during the 1985–86 academic year, and from enforcing the sanctions that required psychiatric treatment and that barred him from holding office in campus organizations. On September 6, 1985, I ordered that the defendants be preliminarily enjoined from enforcing the sanction of compulsory psychiatric examination against the plaintiff, but I declined to order that they be preliminarily enjoined from enforcing the remaining disciplinary sanctions outstanding against him. *Gorman v. University of Rhode Island,* No. 85–0210 (D.R.I. Sept. 6, 1985). Consequently, the plaintiff spent the 1985–1986 academic year on suspension from U.R.I.[4]

The plaintiff now seeks readmission to U.R.I., and challenges the constitutional validity of the sanction requirements on which his readmission is premised. He also challenges the constitutional sufficiency of the procedures that led to his punishment and suspension, and seeks damages for injuries allegedly suffered as a result of these alleged deprivations of constitutional rights.

A trial on these issues was held on June 25–26, 1986. After a careful review of the evidence and arguments offered by all parties, I now hold that the challenged hearing procedures violated the Due Process Clause of the Fourteenth Amendment. All sanctions currently pending against the plaintiff are vacated, and a *de novo* disciplinary hearing that satisfies the requirements of due process must be held. The reasons for my decision are discussed at length below.

## II. Discussion

### A. The Hearing Procedures

■ Governmental decisions that deprive individuals of "liberty" or "property"

---

**4.** Gorman's failure to appeal this Court's partial denial of injunctive relief did not preclude him from raising at the subsequent trial the issues upon which injunctive relief was denied. The right to take an interlocutory appeal from a denial of a preliminary injunction, 28 U.S.C. § 1292(a)(1) (1982), is permissive, not mandatory. *Victor Talking Machine Co. v. George,* 105 F.2d 697 (3d Cir.), *cert. denied,* 308 U.S. 611, 60 S.Ct. 176, 84 L.Ed. 511 (1939); 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure* (Wright & Miller) § 3921, pp. 11–13 (1977). A party who elects not to take such an interlocutory appeal retains the right to proceed to trial and, following judgment on the merits,

to appeal both the trial court's final decree and the court's earlier denial of injunctive relief, except as to issues that have become moot. 16 Wright & Miller § 3921, pp. 11–13 (1977).

None of the issues raised by Gorman at trial are moot. First, pending the decision of this Court, he remains barred from holding office in any student organization upon his return to U.R.I. Second, although his disciplinary suspension has ended, the injury allegedly resulting from it raises issues of damages and liability. The timeliness of these issues operates in turn to preserve the timeliness of the due process challenge against the hearing boards that promulgated the sanctions.

interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment must satisfy the requirements of procedural due process. *Matthews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). The Due Process Clause applies to any such deprivation that is more than *de minimus. Goss v. Lopez,* 419 U.S. 565, 576, 95 S.Ct. 729, 737, 42 L.Ed.2d 725 (1975); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 342, 89 S.Ct. 1820, 1823, 42 L.Ed.2d 725 (1969). Deprivations of liberty interests to which the Due Process Clause applies include circumstances "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 519 (1971), *quoted in Goss,* 419 U.S. at 574, 95 S.Ct. at 736. Even school suspensions for periods as short as ten days implicate more than *de minimus* liberty interests, because such punishments "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment," *Goss,* 419 U.S. at 575, 95 S.Ct. at 736. Suspensions by tax-supported universities involve state action, such that "due process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct," *Dixon v. Alabama State Board of Education,* 294 F.2d 150, 158 (5th Cir.), *cert. denied* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961).

Just how much process is "due" before a public educational institution may suspend a student is difficult precisely to define, apart from a specific factual setting. Due process is a flexible concept, which "calls for such procedural protections as the particular situation demands," *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976), *quoting Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

The only guidance given by the Supreme Court on this particular issue is its holding that "[a]t the very minimum, students facing some kind of suspension ... must be given *some* kind of notice and afforded *some* kind of hearing." *Goss,* 419 U.S. at 579, 95 S.Ct. at 738 (emphasis in original). The Supreme Court expressly cautioned that, in connection with short suspensions, due process would not require students to be afforded the opportunity to secure counsel, to confront and cross-examine witnesses, or to call their own witnesses. 419 U.S. at 583, 95 S.Ct. at 740. However, the Court expressly confined its holding to the ten-day suspension brought before it: "we have addressed ourselves solely to the short suspension, not exceeding 10 days. Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." 419 U.S. at 584, 95 S.Ct. at 741.

The plaintiff Gorman's suspension from U.R.I., initially exceeding one year but reduced to one year by order of this Court, clearly fits into that category of suspensions requiring more than the minimal due process requirements articulated by *Goss v. Lopez.* This Court must now determine how much more than minimal notice and hearing procedures were required in order to afford the plaintiff due process under the Constitution, and whether the University of Rhode Island and its employees complied with those requirements. The plaintiff contends that his due process rights include the following: (1) to be represented by counsel at all disciplinary hearings; (2) to cross-examine the charging parties and all adverse witnesses; (3) to have a transcript provided as well as to make his own tape recording of all hearings; (4) to appear before hearing boards that maintain independence and impartiality in all judgments regarding the charges against him; and finally, (5) to have the University's decision reviewed in this Court under a "substantial evidence" standard. I will address each of these contentions separately.

### 1. Right to Counsel

The plaintiff requested that he be allowed to be assisted by an attorney at the Murphy hearings and at the Rainville hearings. Defendant Weisinger, on behalf of

U.R.I., denied the plaintiff's requests, but the plaintiff was permitted to be advised and assisted by a fellow student at the hearings. The plaintiff contends that the denial of his request to be assisted by legal counsel deprived him of due process, and he cites two cases that required students to be permitted such assistance at school disciplinary hearings.

In one case, the First Circuit held that a university had denied a student due process by refusing permission to his attorney to assist the student's defense on a rape charge before a disciplinary board. *Gabrilowitz v. Newman,* 582 F.2d 100 (1st Cir. 1978). *Gabrilowitz* is distinguishable from the case now before this Court. As I stated in ruling on the plaintiff's motion for a preliminary injunction, "[t]he First Circuit has required the presence of counsel only under the unusual circumstance where a student faces criminal charges based on an incident which also gives rise to the University disciplinary proceeding," *Gorman v. University of Rhode Island,* No. 85–0210 (D.R.I. Sept. 6, 1985) (order granting preliminary injunction in part and denying preliminary injunction in part); *see also Jaksa v. Regents of the University of Michigan,* 597 F.Supp. 1245, 1253–54 n. 10 (E.D.Mich. 1984), *aff'd mem.* 787 F.2d 590 (6th Cir. 1986) ("These cases are distinguishable because they involve the rights of prisoners and parolees, whose liberty interests in their freedom and conditions of confinement are greater than a student's interest in uninterrupted education and remaining free from the stigma of being convicted of cheating on an exam.") The plaintiff has made no showing that criminal charges have been filed because of the incidents that led to his suspension, nor do I find any reason to expect that such charges may be filed.

The plaintiff cites one case in which a federal court required students to be permitted the assistance of legal counsel at a university disciplinary hearing, even though no criminal charges on the acts at issue were pending, *Esteban v. Central Missouri State College,* 277 F.Supp. 649 (W.D.Mo.1967). The weight of authority does not support *Esteban's* holding on this issue, however. *See Madera v. Board of Education of the City of New York,* 386 F.2d 778 (2d Cir.1967), *cert. denied,* 390 U.S. 1028, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968); *Wasson v. Trowbridge,* 382 F.2d 807, 812 (2d Cir.1967) ("Where the proceeding is non-criminal in nature ... due process does not require representation by counsel."); *Jaksa v. Regents of the University of Michigan,* 597 F.Supp. 1245, 1252 (E.D.Mich.1984); *Everett v. Marcase,* 426 F.Supp. 397 (E.D.Pa.1977).

For the above reasons, I hold that the defendants did not deprive the plaintiff of due process by refusing to permit the presence of legal counsel in the disciplinary hearings that led to the plaintiff's suspension.

### 2. Right to Cross Examine Accusers and Adverse Witnesses

█ At the Carr hearing, the plaintiff was not allowed to cross-examine adverse witnesses about potential sources of bias. At the Murphy hearing, the plaintiff was precluded from cross-examining his accuser about potential sources of bias. The plaintiff was, however, permitted to cross-examine all adverse witnesses about their accounts of what they saw.

The cases that have addressed the issue of due process in school and college disciplinary hearings provide at most a very limited right of cross-examination. The first case that required notice and hearing procedures for students threatened with suspensions found no right of cross-examination to inhere in the Due Process Clause. *Dixon v. Alabama State Board of Education,* 294 F.2d 150, 158 (5th Cir.1961) ("This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required."). This holding is still followed by some courts. *See, Winnick v. Manning,* 460 F.2d 545, 549 (2d Cir.1972) ("The right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary settings."); *Jaksa v. Re-*

gents of the University of Michigan, 597 F.Supp. 1245, 1252 (E.D.Mich.1984) ("The Constitution does not confer on plaintiff the right to cross-examine his accuser in a school disciplinary hearing.").

The courts are, however, far from unanimous on this issue. Some districts now recognize a limited right of cross-examination, even in hearings dealing with conduct that presents no risk of criminal charges. See, Dillon v. Pulaski County Special School District, 468 F.Supp. 54, 58 (E.D. Ark.1978), aff'd 594 F.2d 699 (8th Cir.1979) (where a witness was known and present, and her "testimony was critical, ... due process clearly demanded that the plaintiff should have been given an opportunity to question her before the school board at its disciplinary hearing concerning the details of his alleged misconduct."); Gonzales v. McUen, 435 F.Supp. 460, 469 (C.D.Cal.1977) ("where the student is faced with the severe sanction of expulsion, due process does not permit admission of ex parte evidence by witnesses not under oath and not subject to examination by the accused student."); Marin v. University of Puerto Rico, 377 F.Supp. 613, 623 (D.P.R.1974).

The due process right of cross-examination in these latter cases seems limited to the concern that eyewitness accounts of student misconduct be balanced and thorough. These cases do not evince a concern that bias on the part of witnesses and accusers be brought to light. I find no support for the plaintiff's contention that a student has a right to cross-examine witnesses and accusers as to their biases in school disciplinary hearings, particularly where only non-criminal conduct is at issue.

Because the plaintiff was permitted to cross-examine all adverse witnesses about the incidents of his conduct at issue before the hearing boards, I find that the plaintiff was accorded all that due process requires with respect to cross-examination rights.

3. Rights to Transcription and Tape Recording

■ Because the defendant U.R.I. does not make stenographic records of stu-

dent disciplinary hearings, the plaintiff sought permission for the U.R.I. Student Video Center to make an audio-visual recording of the Murphy hearing. This request was denied, and the plaintiff brought suit in the Rhode Island Superior Court requesting that the University be enjoined to allow the recording. The plaintiff's request for injunctive relief was denied, Gorman v. Eddy, No. 84–531 (R.I.Super. Dec. 13, 1984). Prior to the Rainville hearing, the plaintiff requested both that U.R.I. provide him with a stenographic transcript and that he be permitted to tape record the hearing. Defendant Weisinger in writing denied both requests but permitted the plaintiff to make a stenographic record at his own expense. At trial, the plaintiff introduced evidence that a stenographic record would have cost approximately $1800.00.

The federal courts are divided over the two questions raised here by the plaintiff, namely, whether due process requires that a university furnish a student with a transcript of his or her disciplinary proceedings, and whether due process requires that the student be permitted to make his or her own tape recording of the hearings. See, Marin v. University of Puerto Rico, 377 F.Supp. 613, 623 (D.P.R.1973) (requiring that the proceedings be transcribed); Givens v. Poe, 346 F.Supp. 202, 209 (W.D. N.C.1972) ("where exclusion or suspension for any considerable period of time is a possible consequence of proceedings ... due process requires a number of procedural safeguards such as ... the right to make a record of proceedings ..."); Esteban v. Central Missouri State College, 277 F.Supp. 649, 652 (W.D.Mo.1967) ("either side may, at its own expense, make a record of the events at the hearing."); but see Jaksa v. Regents of the University of Michigan, 597 F.Supp. 1245, 1252 (E.D. Mich.1984) ("I am not persuaded that the due process clause requires the University to provide a verbatim transcript of the hearing."); Whitfield v. Simpson, 312 F.Supp. 889, 894 (E.D.Ill.1970) ("There need be no

stenographic or mechanical recording of the proceedings.")

In light of this conflict among the available authorities, my decision must be guided by the three factors that the Supreme Court has held to govern the question of how much process is constitutionally required in particular circumstances, *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). The first factor highlighted by *Mathews* is "the private interest that will be affected by the official action." 424 U.S. at 335, 96 S.Ct. at 903. The threat of a one year suspension implicates a very substantial liberty interest in an uninterrupted education. The reputational damage flowing from such a suspension must be regarded as very serious, in light of the Supreme Court's holding that even a ten day suspension "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment," *Goss v. Lopez*, 419 U.S. 565, 575, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1974). It follows that a student faced with such a long suspension also has a very high interest in receiving fair consideration of the charges and evidence that threaten him or her with suspension.

The second *Mathews* factor considers both "the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335, 96 S.Ct. at 903. As to the first part of this factor, I believe the facts of this case highlight the risk of erroneous or capricious judgment that can accompany campus disciplinary hearings occurring within an emotionally and politically charged atmosphere. Unlike proceedings before courts or administrative agencies, such hearings often require former adversaries within a small campus community to face each other in the respective roles of accused party and adjudicator. The risk that bias will taint such hearings is very significant.

As to the latter part of the second *Mathews* factor, I find the value of a verbatim

hearing record to be twofold. First, it serves a prophylactic function, by confronting all hearing participants with the knowledge that their conduct throughout the proceedings will be subject to public scrutiny. Second, where, as here, the University provides a right to appeal without granting a *de novo* appeal hearing, a verbatim record assures that the appellate review will be based upon a fair consideration of the evidence adduced at the hearing below.

The third *Mathews* factor weights the government's interest, considering "the function involved and the fiscal and administrative burdens" imposed by the additional procedure at issue. 424 U.S. at 335, 96 S.Ct. at 903. The evidence at trial showed that a stenographic record of only the Rainville hearings would have cost about $1800. Requiring such a record in every hearing that considered long suspensions would impose a significant burden on tax-supported universities. However, granting the plaintiff's request that he be permitted to make a tape recording at his own expense would impose virtually no burden on the defendant University.

In sum, the interests at stake are substantial, the risk of error is significant, and the corrective value of a verbatim record is similarly significant. Furthermore, allowing a student to tape-record the hearings imposes no burden upon the University. I therefore hold, based on this balancing test, that where no other verbatim record of the proceeding will be made available, a student threatened with a year-long disciplinary suspension from a public university has the right to tape-record the disciplinary hearings at his or her own expense. The stipulations of fact submitted by the plaintiff and defendants affirm that the University of Rhode Island deprived the plaintiff of this right.

 I am aware that one of the student's interests cited in support of this right, the interest in a fair consideration of the facts on appeal within the university, rests upon the existence of the University's appeals procedure, which has not directly been held to be required by the Due Pro-

cess Clause. This does not necessarily take the student's interest in a fair appeal outside the scope of due process scrutiny. For although a federal court cannot order a school to adopt procedures beyond those required by due process, *Everett v. Marcase*, 426 F.Supp. 397, 401 (E.D.Pa.1977), due process may require that a school consistently apply even those elements of its established procedure that otherwise exceed what due process requires. For example, where a school failed to follow its own notice procedures prior to suspending a student for three days, the Court reasoned as follows:

> Defendants assert ... that, if this court finds that plaintiff was afforded *Goss* due process, then the federal court is without jurisdiction to decide a claim that defendants violated their own rules because such a claim would be a state law issue. The court disagrees with this proposition because *plaintiff may still have a liberty and property interest at stake.* In some situations, due process could be denied where rules of procedure are set forth establishing certain rights and then such rules are not followed. *Hillman v. Elliot*, 436 F.Supp. 812, 817 (W.D.Va.1977) (emphasis added).

Similarly, in this case, the substantial liberty interests of the plaintiff remained at stake when each disciplinary hearing concluded and he elected to challenge the decisions before the University Appeals Board.[5] That a student needs a thorough and accurate record of the hearings below to maintain a fair defense on appeal is undeniable, given the consistently held due process requirement that universities base their suspension decisions on substantial evidence. *See, Slaughter v. Brigham Young University*, 514 F.2d 622, 625 (10th

Cir.), *cert. denied*, 423 U.S. 898, 96 S.Ct. 202, 46 L.Ed.2d 131 (1975); *Givens v. Poe*, 346 F.Supp. 202, 209 (W.D.N.C.1972) ("due process requires a number of procedural safeguards such as ... the requirement that the decision of the authorities be based upon substantial evidence."); *Center for Participant Education v. Marshall*, 337 F.Supp. 126, 136 (N.D.Fla.1972) ("in order to satisfy due process requirements, a university disciplinary proceeding should afford the student ... punishment based only upon substantial evidence adduced at the hearing."); *Black Students of North Fort Myers Jr.-Sr. High School ex rel. Shoemaker v. Williams*, 335 F.Supp. 820, 824 (M.D.Fla.), *aff'd*, 470 F.2d 957 (5th Cir. 1972) ("Imposition of sanctions shall only be on the basis of substantial evidence."); *Scoggin v. Lincoln University*, 291 F.Supp. 161, 171 (W.D.Mo.1968).

In this Circuit, only one district court has addressed the issue of whether a student's opportunity for appeal within the university setting required that a record be made of the hearing below. Unlike the present case, the defendant college's appellate procedure consisted of a trial *de novo*, and on that basis Judge Bownes held that the college's failure to make a record at the hearing below did not amount to constitutional error. *Morale v. Grigel*, 422 F.Supp. 988, 993 (D.N.H.1976).[6] Here, by contrast, U.R.I.'s appellate procedure affords not a trial *de novo*, but a review of the lower hearing board's decision. The only record reviewed by the Appeals Board consisted of summarized reports and a brief, all written by defendant Weisinger who, among other roles, served as advisor to each hearing board and as advocate for the decision

---

**5.** The plaintiff did not appeal the UBSC's decision after the Carr hearings, but he did appeal its decisions after the Murphy and Rainville hearings. Both appeals were denied.

**6.** One other district court in the First Circuit found that a student threatened with suspension had no right to tape record his disciplinary hearing before the local school committee. *Pierce v. School Committee of New Bedford*, 322 F.Supp. 957, 961 (D.Mass.1971). But in that

case, no appellate procedure was available to the student. Rather, the school principal recommended a punishment, and the recommendation was considered along with the student's and principal's evidence at a school committee hearing, which afforded the student significant procedural protections, including the right to remain silent, the right to counsel and the right to cross-examine all witnesses. *Id.* at 960.

below before the Appeals Board.[7] I simply cannot find, consistent with the Constitution, that this procedure afforded the plaintiff's liberty interest adequate protection before the Appeals Board.

### 4. Right to an Independent and Impartial Adjudicator

 An impartial adjudicator is a fundamental ingredient of procedural due process. *See, Megill v. Board of Regents of the State of Florida,* 541 F.2d 1073, 1079 (5th Cir.1976) ("An impartial decisionmaker is a basic constituent of minimum due process."); *Simard v. Board of Education of the Town of Groton,* 473 F.2d 988, 993 (2d Cir.1973); *Winnick v. Manning,* 460 F.2d 545, 548 (2d Cir.1972); *Wasson v. Trowbridge,* 382 F.2d 807, 813 (2d Cir.1967) ("a fair hearing presupposes an impartial trier of fact"). The plaintiff in this case has argued a number of facts purporting to show that the requisite impartiality was breached on several occasions by the defendants. The plaintiff's allegations can be lumped into two general sub-headings: first, that the defendant Ronald Weisinger exerted such undue influence over the various hearing boards that their independence was compromised; and second, that various kinds of bias tainted the deliberations of the hearing boards. I will first consider these two sub-headings separately.

### i. Undue Influence

The defendant Ronald Weisinger, then Acting Director of Student Life at U.R.I., served as the advisor to the University Board on Student Conduct. In this role, he scheduled hearings, allocated room space and provided the relevant parties with notice of each hearing; he ruled on the plaintiff's procedural requests prior to the start of each hearing; he sat with the board members at each hearing advising them on procedural matters; and finally, he participated as a non-voting member in the deliberations that followed each hearing. By his own testimony at trial, defendant Weisinger helped the UBSC draft sanctions against the plaintiff, and he moderated the hearing board's private review of the evidence:

> ... if they were talking about certain facts or incidents that were testified to, I would make sure to ask them individually did they hear it all that way or did they not hear it that way, and if not, to test the other members on the board regarding their recollections. If I felt that they were skipping over a point without fully discussing it, that [sic] I would ask them to go back and talk about it some more.

Record at 149, *Gorman v. University of Rhode Island.*

 Due process requires that school and college hearing boards exercise independent judgment, such that they do more than just ratify officials' evidentiary conclusions and disciplinary sanctions. *See Strickland v. Inlow,* 519 F.2d 744, 745 (8th Cir.1975); *Lee v. Macon County Board of Education,* 490 F.2d 458, 461 (5th Cir.1974) ("Formalistic acceptance or ratification of the principal's request or recommendation as to the scope of punishment, without independent Board consideration of what, under all the circumstances, the penalty should be, is less than full due process.").

 Defendant Weisinger is an administrative official employed by defendant U.R.I., and, by his own testimony, he selected the charges to be filed against the plaintiff in each case. The evidence as to

---

**7.** Following each hearing from which the plaintiff took an appeal, the Appeals Board's only record of the proceedings below consisted of a report written by the UBSC's advisor, defendant Weisinger. In addition, because the plaintiff's appeal from the Murphy hearings alleged procedural violations, defendant Weisinger prepared and submitted a brief to the Appeals Board rebutting the plaintiff's allegations. During both the Murphy and Rainville appeals, more-over, defendant Weisinger appeared before the Appeals Board as the advocate for the UBSC's decisions. Record at 137–143, *Gorman v. University of Rhode Island* (testimony of defendant Weisinger). Thus defendant Weisinger represented conflicting interests before the Appeals Board, between his neutral role as court reporter for the UBSC, and his partisan role as appellate advocate for the verdict of the UBSC.

his influence over the UBSC thus directly implicates the question of whether the hearing boards' independent judgment was compromised. Involvement with hearing board deliberations on a level equivalent to defendant Weisinger's has been found to render a school board expulsion hearing "fundamentally unfair." *Gonzales v. McUen*, 435 F.Supp. 460, 465 (C.D.Cal. 1977). In that case, a school district superintendent sat with the school board members during the hearings, served as chief advisor to the board, and acted as secretary to the board on one occasion. 435 F.Supp. at 465. In finding that the superintendent's participation deprived the students of due process, the Court observed,

> ... at least on one occasion, ... Superintendent McUen was present with the Board for approximately forty-five minutes during its deliberations on the issue of expelling these plaintiffs....
>
> ... Whether or not he did participate, his presence to some extent might operate as an inhibiting restraint upon the freedom of action and expression of the Board.

435 F.Supp. at 465.

Not all courts are so receptive to findings of undue influence. Where a school board's legal counsel both presented the superintendent's case for a teacher's dismissal and served as advisor to the school board in its consideration of the matter, the Court refused to find a due process deprivation, observing, "A school board, after all, can hardly be said to be its hired counsel's puppet." *Breitling v. Solenberger*, 585 F.Supp. 289, 291 (W.D.Va.), *aff'd mem.* 749 F.2d 30 (4th Cir.1984). I doubt, however, that a hearing board consisting almost exclusively of students can be presumed to be so independent from a university administrator, particularly from one who participates in its functions as extensively as defendant Weisinger. Beyond the obvious distinctions as to relative ages and maturity levels, I must regard the school board situation as distinguishable, because of the school board's independent electoral base vis-a-vis its legal counsel, in contrast to U.R.I.'s hearing board members, whose permanent appointments to the board are contingent on the approval of the Student Life Advisor, i.e., defendant Weisinger. With respect to student disciplinary boards, therefore, *Gonzales* rather than *Brietling* provides the appropriate precedent. Following *Gonzales*, I find that defendant Weisinger's involvement in the UBSC's deliberations compromised their independence to a degree that violates the requirements of due process.

### ii. Bias

As stated in the recitation of facts, the plaintiff contends that each of the hearing boards before which he appeared included members who were biased. First, he contends that the student chairperson of all three hearings, Julia Emmets, had in a prior year expressed a general bias against "people who went against the system." He also contends that she had a particular bias in the last two (Murphy and Rainville) hearings, because she had already found him guilty of the charges raised in the earlier Carr hearing. Second, the plaintiff contends that the student Roberto Pietersz, who served on the Murphy and Rainville hearing boards, was biased because Pietersz had opposed the plaintiff's chairmanship the previous year of the Student Senate's affirmative action committee, and the plaintiff and Pietersz had publicly disagreed about affirmative action policies. Third, the plaintiff contends that defendant Weisinger, who participated extensively as a non-voting member in all three hearing boards' deliberations, was biased because Weisinger was a personal friend of the charging party in the second hearing, Student Senate Secretary Melanie Murphy. Defendant Weisinger refused to answer the plaintiff's questions on that point at the Murphy hearings.

This Circuit recently reaffirmed the principle that "in some cases, a Hearing Examiner may be so biased as to destroy the fairness of the hearing." *Cloud v. Trustees of Boston University*, 720 F.2d 721, 725 (1st Cir.1983). The courts are somewhat

divided, however, about the kind of bias that gives rise to a due process violation. The Court in *Cloud*, which failed to find any significant bias, suggested that "a previous adverse position" held by a hearing examiner against the accused student could suffice to destroy the fairness of a disciplinary hearing. 720 F.2d at 725. But the cases distinguish between a prior adverse position stemming from an examiner's prehearing involvement in a case, and a prior adverse position arising from sources entirely separate from the facts before the hearing board. *Compare Wasson v. Trowbridge*, 382 F.2d 807, 813 (2d Cir.1967) ("prior official involvement in a case renders impartiality most difficult to maintain ...") *with Hillman v. Elliot*, 436 F.Supp. 812, 816 (W.D.Va.1977) ("To be denied due process, plaintiff must show prejudice by the principal stemming from a source other than knowledge of the case.")

 As to the first of these bias criteria, prior official involvement in a case, the law is clear that mere prior familiarity on the part of a hearing adjudicator does not by itself give rise to a due process violation. *See, Megill v. Board of Regents of the State of Florida*, 541 F.2d 1073, 1079 (5th Cir.1976) ("mere familiarity with the facts of the case gained by [School Board members] did not disqualify them as decisionmakers"); *Gonzales v. McUen*, 435 F.Supp. 460, 464 (C.D.Cal.1977). Due process is violated only where the level of prior involvement creates the "probability that the decisionmaker would be tempted to decide the issues with partiality to one party or the other," *Gonzales* at 464.

 In this case, I believe the evidence demonstrates that that probability was reached. I have already catalogued the many functions carried out by defendant Weisinger in his role as advisor to the UBSC. In addition to these functions, Weisinger advised the charging parties Carr and Murphy how to draft their complaints; gathered facts to determine whether the complaints had merit; selected the charges on which the plaintiff was to be tried; authored the reports on the UBSC's hearings that served as the record for the Appeals Board's review; and spoke as the advocate for the UBSC's decisions before the Appeals Board. Such extensive participation in virtually every phase of every hearing provides a textbook example of the kind of involvement that renders impartiality little more than a fiction.

The fact that defendant Weisinger was not a voting member of the three hearing boards cannot serve to shield his activities from due process scrutiny on the question of bias. His continuous presence and participation in their deliberations rendered his role inseparable from those of the voting members, such that his potential bias requires judgment by the same standard applicable to the voting members.

The prior official involvement of the voting members also raises serious problems. Of the six members on the Murphy hearing board, two had served on the Carr panel, which found the plaintiff guilty of verbal abuse and harassment by a unanimous vote.[8] Of the six members on the Rainville hearing board, virtually all had served on either the Carr or Murphy panels, both of which had arrived at guilty verdicts by unanimous votes.[9]

Even if this Court were to follow only the second bias criterion, prejudice stemming from sources apart from knowledge of the case, the plaintiff would still have shown at least two significant bias problems. Roberto Pietersz, who had spoken out against the plaintiff's appointed role and personal views regarding campus af-

---

8. The chairperson, Julia Emmets, and another undergraduate board member, Robin Scantlebury, both served on the previous Carr Hearing board. Plaintiff's Exhibit 1, items "G" and "R", *Gorman v. University of Rhode Island.*

9. The chairperson, Julia Emmets, had chaired both the Carr and Murphy hearings. Under-

graduate Sharon Marot, graduate student Margaret Menzies and faculty member Robert Gough had served on the Carr hearing board. Undergraduates Roberto Pietersz and Lisa Lepore had served on the Murphy hearing board. Plaintiff's Exhibit 1, items "G", "R", and "CC", *Gorman v. University of Rhode Island.*

firmative action policy, served on both the Carr and Rainville hearing boards. It has been held that "[b]ias is presumed to exist ... in cases in which the adjudicator ... has been the target of personal attack or criticism from the person before him." *Gonzales v. McUen,* 435 F.Supp. 460, 464 (C.D.Cal.1977).[10] Although the evidence in the record shows the prior criticism flowing in the opposite direction—from the adjudicator to the accused student—I find it difficult to believe that this constitutes any less evidence of bias than the reverse of these facts would reveal. In addition to this evidence, the plaintiff sought to show bias on the part of defendant Weisinger, based on an alleged friendship between Weisinger and the plaintiff's accuser in the Murphy hearing. Such a friendship, if it existed, would have provided another reason for defendant Weisinger to recuse himself from the influential role he played in the Murphy hearings. Defendant Weisinger's failure to answer the plaintiff's questions on this matter only leaves a further cloud over the issue of the Murphy hearing board's impartiality. Finally, as to the testimony alleging hearing board chairperson Julia Emmets' expressed "dislike of people who went against the system," the record shows that this opinion was allegedly expressed "a few years back." Record at 116, *Gorman v. University of Rhode Island.* As such, its significance for the hearings at issue may be doubted. Still, insofar as the defendants' direct examination of Emmets made no attempt to rebut this allegation of bias, record at 150–152, I cannot wholly disregard the plaintiff's evidence on this point.

Considering the evidence of bias in its entirety, I find that the hearing boards before which the plaintiff appeared were insufficiently free of bias to satisfy the requirements of due process.

### iii. Impartiality of the Adjudicator Under the Totality of Circumstances

I have found that the evidence offered by the plaintiff on the issue of impartiality necessitates two findings, either of which alone rises to the level of a due process violation: first, that the defendant Ronald Weisinger, as an agent of the defendant University, exerted such influence over the various hearing boards as to compromise their necessary independence; and second, that the cumulative likelihood of bias on the part of hearing board members rendered the proceedings insufficiently impartial. However, if the evidence on either of these points were insufficient by itself to establish a due process deprivation, I must emphasize that the evidence on these points taken together raises far too many doubts on the issue of impartiality to allow a finding that due process has been satisfied.

### 5. Right to "Substantial Evidence" Review

The plaintiff correctly contends that due process requires schools and colleges to base their suspension decisions on "substantial evidence." *See,* discussion of substantial evidence requirement and supporting citations at part II, A, 3, *supra.* However, the standard that academic institutions must follow in their own decision-making as regards suspensions is higher than the standard that federal courts must follow in reviewing such institutions' decisions. In reviewing due process claims, federal courts need only find that "some

---

**10.** Six years earlier, the District Court for the District of Massachusetts rejected the same argument in the context of a student suspension approved by a school committee, one of whose members had been labeled a "fascist pig" by the suspended student. *Pierce v. School Committee of New Bedford,* 322 F.Supp. 957, 962 (D.Mass. 1971). The Court observed that presuming bias from such facts would provide "a very simple device for any unruly, insubordinate troublemaker in the school to put himself beyond the risk of expulsion, simply by hurling nasty names at the only people with authority to pass on his case." *Id.* The risk of such abuse does not arise from the facts of this case. The "personal attack" at issue here occurred a number of months prior to the incidents reviewed by the UBSC, and was made *by* one of the UBSC's members *against* the student subsequently brought up on charges. To present the possibility of abuse imagined in *Pierce,* the attack would have to have been made *by* the accused student, *after* he knew that he would be summoned to appear before a hearing board.

evidence" supports the decision of the school or college disciplinary board. *McDonald v. Board of Trustees of the University of Illinois*, 375 F.Supp. 95 (N.D. Ill.), *aff'd*, 503 F.2d 105 (7th Cir.1974).

 The plaintiff's argument that there is no substantial evidence to support the UBSC is therefore not an issue on which this Court can rule. Furthermore, because the defendants' due process violations entitle the plaintiff to a disciplinary hearing *de novo*, the question of whether the UBSC's decisions are supported by "some evidence" is now moot.

### B. Substantive Sanctions

The plaintiff also challenges the substantive sanctions imposed by the Rainville hearing board, with which the plaintiff was required to comply as a condition of re-entering the University of Rhode Island this fall. The sanctions consisted of, first, compulsory psychiatric evaluation and, if recommended, a course of psychiatric treatment, and second, compliance with a ban upon serving either as a Student Senator, Senate Committee member, or officer of any recognized student organization on campus.

Because I have found that the plaintiff is entitled to a hearing *de novo*, my order will in effect vacate the sanctions presently outstanding against the plaintiff. A final opinion as to the constitutionality of these sanctions is therefore not called for at this time.

 However, the possibility that similar sanctions might be considered by U.R.I.'s disciplinary hearing boards in the future compels me to reiterate what I said in preliminarily enjoining the defendants from enforcing the compulsory psychiatric sanction against the plaintiff. *Gorman v. University of Rhode Island*, No. 85–0210 (D.R.I. Sept. 6, 1985). I said then that the sanction of compulsory psychiatric treatment is "a shocking extreme." *Id.* at 9. An individual has a constitutionally protected right to privacy, *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), and this privacy right covers "the individual interest in avoiding disclosure of personal matters [and] the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). As I said in my earlier order,

> I think it beyond dispute that an individual's decision whether or not to seek psychiatric care or treatment falls within this definition of a protected privacy interest. *Accord, Hawaii Psychiatric Soc., Dist. Branch v. Ariyoshi*, 481 F.Supp. 1028, 1038 (D. Hawaii 1979). The decision to pursue treatment is a sensitive and highly personal one, and indeed, treatment can often be effective only if the patient is willing and receptive. In addition, a certain stigma may often attend such treatment, and this stigma should not be thrust upon an unwilling individual without good cause.

*Gorman v. University of Rhode Island*, No. 85–0210, 9–10 (D.R.I. Sept. 6, 1985).

Such an invasion of protected privacy rights can survive constitutional scrutiny only if it furthers a compelling state interest. As I said in my earlier order, I find no evidence of a serious psychological disorder in the plaintiff's behavior that might give rise to a compelling state interest in enforcing the psychiatric sanction. In short, I doubt that such a punishment, under facts similar to those presented in this case, could survive a constitutional challenge.

### C. Damages [11]

 The plaintiff has asked for compensatory damages for harm suffered as a

---

**11.** The plaintiff's damages claim raises a further question about his failure to appeal this Court's earlier decision not to enjoin his one-year suspension, *Gorman v. University of Rhode Island*, C.A. No. 85–0210 (D.R.I. Sept. 6, 1985). A reversal on appeal would have prevented the major injury for which the plaintiff now seeks damages. His failure to appeal might therefore be viewed as a failure to mitigate damages. But this view extends far beyond the established rule, which holds that an injured party need not make unreasonable exertions or incur unrea-

result of the year's suspension and other sanctions, and he has asked for punitive damages in the amount of one dollar. Whether such alleged harms are attributable to the defendants' deprivation of the plaintiff's due process rights cannot be determined until a *de novo* hearing has been held and a decision rendered.[12] I must therefore postpone a hearing on the question of damages until *de novo* disciplinary proceedings in compliance with my order have been completed.

### III. Order

The defendants, University of Rhode Island, Ronald Weisinger, A. Robert Rainville, and Edward Eddy, have rendered verdicts and issued sanctions against the plaintiff, Raymond J. Gorman, III, through a series of campus disciplinary proceedings that violated the Due Process Clause of the Fourteenth Amendment. Pursuant to 42 U.S.C. § 1983, the defendants are liable to the plaintiff for depriving him, under color of state law, of rights secured by the Constitution.[13]

I therefore order that the defendants be permanently enjoined from enforcing any and all sanctions that were issued as a result of these constitutionally defective hearing procedures. The sanctions enjoined include the following: the sanction requiring the plaintiff to obtain psychiatric evaluation and any recommended treatment; the sanction barring him from serving as either a Student Senator, Senate Committee member, or officer of any recognized student organization; the sanction placing the plaintiff on disciplinary probation; and the sanction barring him from resuming studies at U.R.I. until he complies with all the other sanctions.

I further order that the defendants purge from the plaintiff's records all evidence of charges brought, hearings held, sanctions issued by and appeals taken from the Carr, Murphy and Rainville hearing boards. The sanctions ordered purged include not only those still pending against the plaintiff prior to the issuance of this order, but also those that had either expired or been fully complied with prior to the issuance of this order.

I further order the defendants to afford the plaintiff a *de novo* hearing or series of hearings that comply with the requirements of due process, to reconsider all charges that were brought against him in the academic year 1984–85 by Melanie Murphy and defendant A. Robert Rainville.[14]

sonable expenses in order to mitigate damages. *Hidalgo Properties, Inc. v. Wachovia Mortgage Company,* 617 F.2d 196, 200 (10th Cir.1980). Merely seeking an injunction from the district court to abate the source of injury has been held to exceed the requirements of damage mitigation. *Westman Commission Co. v. Hobart Corp.,* 541 F.Supp. 307, 309–310 (D.Colo.1982). A fortiorari, appealing the denial of injunctive relief clearly lies beyond an injured plaintiff's mitigation duty.

**12.** In § 1983 actions that successfully allege due process violations, the defendant may defeat the plaintiff's claim for damages by proving that the plaintiff would have suffered the same damages in the absence of the violation. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); S. Nahmod, *Civil Rights & Civil Liberties Litigation* § 4.05 (1979).

**13.** The plaintiff has also alleged liability pursuant to 42 U.S.C. § 1985. To succeed on a civil rights claim under § 1985, the plaintiff must prove, among other things, that two or more persons conspired to interfere with his civil rights. *See, e.g., United States ex rel. Simmons*

*v. Zibilich,* 542 F.2d 259, 261–62 (5th Cir.1976). Proof that a number of officials and agents of one university participated in a decision that deprived the plaintiff of his civil rights does not constitute proof of a conspiracy for purposes of 42 U.S.C. § 1985. *See, Herrmann v. Moore,* 576 F.2d 453, 458–59 (2d Cir.), *cert. denied,* 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978); *Davidson v. Yeshiva University,* 555 F.Supp. 75, 79–80 (S.D.N.Y.1982); *Lieberman v. Grant,* 474 F.Supp. 848, 875 (D.Conn.1979). Because the plaintiff offered no affirmative proof of a conspiracy, his claim for relief based on 42 U.S.C. § 1985 is hereby denied.

**14.** I decline to order a *de novo* reconsideration of the decision reached by the UBSC upon the charges filed in September, 1984 by Vera Carr. It is true that my findings necessitate the holding that the Carr hearing board lacked sufficient impartiality to satisfy the requirement of due process. *See* part II, A, 4 of this opinion, *supra.* However, any issues that could be raised based upon the Carr hearings are now moot. First, the sanctions issued by the Carr hearing board have expired: disciplinary probation lasting un-

To remedy the particular due process violations that have been brought to this Court's attention, the defendants are specifically ordered to permit the plaintiff to tape-record the hearings at which he appears, and to take all necessary steps to structure the hearing procedures in a way that preserves the independence and impartiality of the hearing boards. This order also requires that, if the plaintiff's conduct is found in any way to have violated University regulations as alleged in the charges, such a finding be followed by *de novo* consideration of disciplinary sanctions.[15]

I further order, pursuant to 42 U.S.C. § 1988, that the plaintiff be awarded costs and attorneys' fees, to be determined after a hearing before this Court that will review evidence and make findings.

So ordered.

til April 4, 1985 expired on its own accord, and the requirement that the plaintiff obtain one counseling session expired when he obtained the session on November 5, 1985. Second, there no longer exists compensable injury attributable to the Carr hearing board's sanctions, as a result of my ordering that the plaintiff's records be purged of all evidence of charges, hearings and sanctions.

Still, this discussion should make clear to the defendants the impropriety of allowing any mention of the Carr hearing board's findings at the *de novo* Murphy hearing. The similarity of the Carr and Murphy charges and the constitutional defects of the Carr hearing board conclusively argue against allowing the Carr findings into evidence at the *de novo* Murphy hearing.

**15.** Should the rehearing on the Murphy charges result in findings different than those of the previous Murphy hearing, the *de novo* hearing on the Rainville charges could become moot. For instance, if the plaintiff is acquitted of the Murphy charges, then there can be no basis for rehearing the Rainville charges, which alleged the plaintiff's non-compliance with the previous Murphy panel's sanctions. Similarly, if the *de novo* Murphy hearing finds the plaintiff guilty but issues different sanctions than the previous Murphy panel's, then the plaintiff's conduct at issue in the Rainville charges may be viewed in a less inculpatory light. Finally, even if circumstances permit a reconsideration of the Rainville charges, the reconstituted Rainville hearing board will be obliged to consider, as a mitigating factor, the plaintiff's good faith belief that the sanctions he allegedly violated were issued in derogation of his constitutional rights.