Raymond J. GORMAN, III, Plaintiff, Appellee,

v.

UNIVERSITY OF RHODE ISLAND, et al., Defendants, Appellants.

No. 86–2101.

United States Court of Appeals, First Circuit.

Heard June 2, 1987.
Decided Jan. 19, 1988.

---

for the District of Rhode Island. Gorman, a student at the University, contests the validity of sanctions, including suspension, imposed upon him after certain university disciplinary hearings. The district court found that the disciplinary hearings held by the University violated Gorman's right to due process of law as secured by the fourteenth amendment to the Constitution. Hence, the district court held that the University of Rhode Island was liable to Gorman, pursuant to 42 U.S.C. §§ 1983 & 1988, for deprivation, under color of state law, of Gorman's constitutionally protected civil rights. *Gorman v. University of Rhode Island*, 646 F.Supp. 799, 815 (D.R.I.1986).

The University contends that the district court committed error in holding that the public university's hearing procedures did not afford Gorman adequate due process protection. On cross-appeal, Gorman contends that the court erred in finding that due process did not entitle him to representation by counsel at the disciplinary hearings, nor to cross-examine hearing board members and witnesses on his allegations of bias.

The question presented on this appeal is whether the district court erred in holding that the disciplinary hearings conducted by the University denied Gorman the right to due process of law, in violation of the fourteenth amendment. Since we hold that, under the circumstances presented, Gorman's contentions are without merit, and that the University employed adequate procedures which satisfied the requirements of due process, the decision of the district court is affirmed in part and reversed in part.

Nicholas Trott Long, Kingston, R.I., with whom Barbara E. Grady, Providence, R.I., was on brief, for defendants, appellants.

Marc B. Gursky with whom Lovett, Schefrin & Gallogly, Providence, R.I., was on brief, for plaintiff, appellee.

Before BREYER and TORRUELLA, Circuit Judges, and RE,[*] Judge.

RE, Chief Judge:

Both parties to this action, Raymond J. Gorman, III (Gorman), and the University of Rhode Island (the University), appeal from a final order entered on October 14, 1986, in the United States District Court

### The Facts

Gorman enrolled in the University of Rhode Island in September 1981. Over the next few years, Gorman participated in student government, and was appointed to serve on the Student Senate. He was an active member of several student committees involved in university administration, and, in this capacity, often promoted "controversial" policies. The Student Senate

---

[*] Chief Judge of the United States Court of International Trade, sitting by designation.

budget proposals made by Gorman successfully cut the budget of the University's entertainment committee, and defeated a salary increase for the Student Senate's secretary, Melanie Murphy.

In September 1984, Gorman was involved in altercations with two university employees. On September 17, Gorman had an argument with Vera Carr, then Acting Director of the University Student Union, over staff use of a student van. On September 18, Gorman had another argument about the van, this time with the Student Senate's secretary, Melanie Murphy. Both women subsequently filed complaints with the University, charging Gorman with verbal abuse, harassment, and threats, in violation of section 2.4 of the University's student handbook entitled *Student Rights and Responsibilities 1984–85* (Student Handbook).

Gorman was duly notified that separate hearings on these charges would be held pursuant to the provisions in the University Manual. The Preamble to the University Manual states that it is a "compilation of legislation, policies and administrative regulations for the government of the University of Rhode Island...." Incorporated within the manual are provisions on the relationship between students and the administration, including their respective rights and responsibilities. The applicable provisions of the manual are also set forth in the Student Handbook.

The hearings on the charges against Gorman were held before the University Board on Student Conduct (UBSC), which was convened pursuant to section 9.23.10 of the University Manual. Pursuant to section 5.9.11 of the University Manual the board for each hearing consisted of one faculty member and five students. In addition, section 9.23.15 of the manual required that a staff member from the Office of Student Life serve as advisor to the UBSC in all stages of the university judicial process. The Acting Director of Student Life, Ronald Weisinger, served as the advisor to the University board, which heard the charges against Gorman, and participated in its meetings as a non-voting member.

The hearing on the Carr complaint was held on October 4, 1984 and lasted approximately 7 hours. The UBSC was chaired by a student, Julia Emmets, pursuant to section 5.19.13 of the University Manual which states that "[t]he board shall be chaired by a student member elected by a majority vote of the board." After the hearing, the UBSC unanimously found Gorman guilty of harassing and intimidating Carr and impeding her in the performance of her duties. As a result, Gorman was placed on disciplinary probation for 6 months, and was required to attend one session at the University's counseling center. Gorman complied with both of these sanctions.

The hearing on the Murphy complaint was held on October 25, 1984, November 8, 1984, and January 14, 1985, and lasted approximately 20 hours. At this hearing, the UBSC consisted of three new student members and two students who had been members on the prior board, including Julia Emmets who again served as chair. Weisinger again served as the non-voting advisor to the board, and also participated as a witness. Gorman objected to the presence of several members of the UBSC on the grounds of bias. Specifically, Gorman alleged bias on the part of two students, Julia Emmets, who allegedly had expressed a dislike for "people who went against the system," and Roberto Pietersz, who had opposed Gorman's position on a student government committee. These objections were denied, and, at the conclusion of the hearing, Gorman was found guilty. The board imposed sanctions consisting of a permanent ban from office in any recognized student organization, a mandatory examination by the University's consulting psychiatrist, and, if recommended, commencement of a course of treatment.

The UBSC's decision on the Murphy charge was appealed by Gorman to the University Appeals Board, which consisted of two faculty members and one student. The Appeals Board based its review on the record of the hearings prepared by Weisinger, the UBSC advisor. Pursuant to section 9.23.17 of the University Manual, a record of each hearing was made and main-

tained by the Office of Student Life. Weisinger appeared before the Appeals Board on behalf of the UBSC, and, in accordance with university practice, submitted a rebuttal brief concerning plaintiff's procedural objections. The Appeals Board upheld the decision of the UBSC.

Gorman failed to comply with the sanctions imposed by the UBSC, and, on March 5, 1985, formal charges were filed by the Vice President of the University, A. Robert Rainville. Gorman was notified that he was charged with three counts of violating section 2.2 of the Student Handbook, and a hearing was scheduled for March 28. Two days before the hearing, by letter to Weisinger, Gorman made several procedural requests. Specifically, he requested an open hearing, permission to have legal counsel present, permission to tape record the proceedings, total media access to the proceedings, and a stenographic record to be provided at the University's expense. Although these requests were denied, Gorman was informed that he would be allowed to make a stenographic record of the hearing at his own expense, provided that the University was also allowed to obtain a copy.

At the March 28 hearing, in addition to objecting to Weisinger serving as advisor to the board, Gorman again objected to the inclusion of two students whom Gorman had accused of bias at the November 8 hearing.

The UBSC found Gorman guilty of not complying with UBSC decisions in violation of section 2.2 of the Student Handbook, and imposed three sanctions against him: (1) immediate suspension from the University through the following academic year, (2) the suspension to continue until he complied fully with all sanctions which had been imposed against him, and (3) disciplinary probation throughout the remainder of his undergraduate enrollment. The decision of the UBCS provided for a stay of the suspension to allow Gorman to finish the spring 1985 semester on two conditions: (1) Gorman's immediate resignation from all student government positions, and, (2) within one week, examination and commencement of any recommended treatment by the University's consulting psychiatrist. The final sanctions were also reviewed and approved by the President of the University, Edward D. Eddy. Gorman appealed the decision of the UBSC, and on April 15, 1985, the University Appeals Board denied Gorman's appeal.

On April 16, 1985, Gorman filed this action in the United States District Court for the District of Rhode Island, and moved to enjoin enforcement of the sanctions. Judge Selya granted the motion, and issued a temporary restraining order, enjoining defendants from suspending Gorman before the end of the spring 1985 semester, "unless some other ... cause is created or exists, ... which would otherwise give them the right to suspension or expulsion." The court also ordered Gorman to refrain from serving as an officer in any Student Senate recognized organization. Both parties complied with the order, which expired on May 15, 1985.

Gorman also moved for a preliminary injunction seeking relief from the district court for the sanctions imposed against him by the University. On September 6, 1985, Judge Pettine enjoined the defendants from enforcing the sanction for psychiatric treatment, but otherwise denied relief. *Gorman v. University of Rhode Island,* No. 85-0210 (D.R.I. Sept. 6, 1985). As a result, Gorman remained on suspension throughout the 1985-1986 school year.

The case proceeded to trial, and the district court held that the University procedures violated the due process clause of the fourteenth amendment, and that, "[p]ursuant to 42 U.S.C. § 1983, the defendants are liable to the plaintiff for depriving him ... of rights secured by the Constitution." *Gorman v. University of Rhode Island,* 646 F.Supp. 799, 815 (D.R.I.1986). In a thorough opinion by Judge Pettine, the district court held that Gorman's request to tape record the hearings should have been granted. The court also held that "Weisinger's involvement in the USBC's deliberations compromised their independence to a degree that violates the requirements of due process." *Id.* at 811. Hence, all sanc-

tions were vacated, and the University was ordered to purge Gorman's records of all references to the proceedings and charges. The University was also ordered "to afford the plaintiff a *de novo* hearing or series of hearings that comply with the requirements of due process." *Id.* at 815.

## Discussion

As early as Magna Carta, procedure was regarded as a valuable means for the protection of the rights of litigants. In America, with the object of preventing an arbitrary government, procedural safeguards were guaranteed to all persons by the inclusion of "due process" clauses in the federal and state constitutions. Few principles of law, applicable as well to the administrative process, are as fundamental or well established as "a party is not to suffer ... without an opportunity of being heard." *Painter v. Liverpool Oil Gas Light Co.*, 11 Eng.Rep. 478, 484, 3 Adm. & Eccl. 433, 448–49 (K.B.1836). For the American, in the words of Justice Frankfurter, "*[a]udi alteram partem*—hear the other side!—a demand made insistently through the centuries, is now a command, spoken with the voice of the Due Process Clause of the Fourteenth Amendment...." *Caritativo v. California*, 357 U.S. 549, 558, 78 S.Ct. 1263, 1267, 2 L.Ed.2d 1531 (1958) (Frankfurter, J., dissenting).

█ The fourteenth amendment to the United States Constitution provides that no state shall deprive any person of life, liberty, or property without due process of law. There is no doubt that due process is required when a decision of the state implicates an interest protected by the fourteenth amendment. It is also not questioned that a student's interest in pursuing an education is included within the fourteenth amendment's protection of liberty and property. *See Goss v. Lopez*, 419 U.S. 565, 574–75, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975). Hence, a student facing expulsion or suspension from a public educational institution is entitled to the protections of due process. *See id.* at 575–76, 95 S.Ct. at 737; *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 157 (5th Cir.), *cert.*

*denied*, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed. 2d 193 (1961).

█ To say that an interest is protected by the due process clause of the Constitution, however, is only the beginning of the inquiry. In the language of the Supreme Court, "[o]nce it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Due process, which may be said to mean fair procedure, is not a fixed or rigid concept, but, rather, is a flexible standard which varies depending upon the nature of the interest affected, and the circumstances of the deprivation. *See Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976); *Morrissey v. Brewer*, 408 U.S. at 481, 92 S.Ct. at 2600. The time-honored phrase "due process of law" expresses the essential requirement of fundamental fairness. Yet, it "does not impose an unattainable standard of accuracy." *Grannis v. Ordean*, 234 U.S. 385, 395, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). Hence, the procedures employed in a disciplinary action must be tested by the extent to which they comport with the requirement of fundamental fairness. *See* Buss, *Procedural Due Process For School Discipline: Probing the Constitutional Outline*, 119 U.Pa.L.Rev. 545, 551 (1971).

Notice and an opportunity to be heard have traditionally and consistently been held to be the essential requisites of procedural due process. *See Goldberg v. Kelly*, 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970); *Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). It has been stated with crystal clarity that "[n]otice and opportunity to be heard are fundamental to due process of law." *Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 178, 71 S.Ct. 624, 652, 95 L.Ed. 817 (1951) (Douglas, J., concurring). Suffice it to say that notice and a fair hearing require that a

person be heard prior to being deprived of a vital legally protected interest.

The hearing, to be fair in the due process sense, implies that the person adversely affected was afforded the opportunity to respond, explain, and defend. Whether the hearing was fair depends upon the nature of the interest affected and all of the circumstances of the particular case. The courts have stated that an opportunity to be heard requires that an individual be afforded "some kind of hearing." *See Goss v. Lopez*, 419 U.S. at 579, 95 S.Ct. at 738 (emphasis omitted). In the administrative process, the words "some kind of hearing" have acquired a meaning which implies all of those elements of fairness which go to the heart of the concept of due process in the particular case. *See generally* Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267 (1975). In determining whether due process has been denied, the courts have had to ascertain the scope of the protection required in a particular setting, as well as an "accommodation of the competing interests involved." *Goss v. Lopez*, 419 U.S. at 579, 95 S.Ct. at 738. In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court identified three factors that must be considered:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [state] interest, including the function involved and fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903.

Although it dealt with the expulsion of students rather than with a suspension, a valuable discussion of the procedural due process rights of students is found in the case of *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150 (5th Cir.), *cert. denied*, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961). Indeed, in student discipline cases, since that case, the federal courts have uniformly held that fair process requires notice and an opportunity to be heard before the expulsion or significant suspension of a student from a public school.

The plaintiffs, in *Dixon*, students in good standing at the Alabama State College, were protesting the practice or policy of segregation, and participated in several sit-in demonstrations off-campus. As a consequence, they were summarily expelled. The notice of expulsion stated no specific grounds for the action, and the students were not given an opportunity to explain or refute the charges of alleged wrongdoing. The students sought injunctive relief, alleging a violation of their right to due process of law. The university maintained that, absent any statute or rule requiring further procedures, the action of the university in expelling them was legal and constitutional.

The trial court upheld the dismissal and denied relief. The United States Court of Appeals for the Fifth Circuit reversed, and stated that "whenever a governmental body acts so as to injure an individual, the Constitution requires that the act be consonant with due process of law." 294 F.2d at 155. In determining the minimum procedural requirements necessary to satisfy due process, the court balanced the interests of the parties under the particular circumstances. *Id.* at 157. The plaintiffs' interest in remaining at the college in which they were students in good standing, was balanced against the interest of the school administration to dismiss or expel students for the general benefit of the institution. *Id.* The potential for arbitrary action on the part of the school officials, and the absence of any immediate danger posed by the students, led the court to hold that the Board of Education was required to exercise "at least the fundamental principles of fairness by giving the accused students notice of the charges and an opportunity to be heard in their own defense." *Id.*

In delineating the nature of the hearing, the court noted that a charge of misconduct, which may easily be colored by the point of view of the witness, "requires

something more than an informal interview with an administrative authority of the college." *Id.* at 158. The court however, added that "[t]his is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required." *Id.* at 159.

The Supreme Court in *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), considered the procedural due process issue in the context of disciplinary action taken by a public educational institution. In that case, students suspended for disciplinary reasons, challenged the statutory authority of Ohio's public school principals to suspend students for up to 10 days without prior notice or a hearing.

The Court held that a 10–day suspension was not a *de minimus* deprivation of the students' property or liberty interests in an education, and, therefore, could not be imposed in "complete disregard of the Due Process Clause." 419 U.S. at 576, 95 S.Ct. at 737. Hence, the Court held the statute to be unconstitutional, and concluded that, at the very minimum, students must be given "*some* kind of notice and afforded *some* kind of hearing." *Id.* at 579, 95 S.Ct. at 738. (emphasis in original).

After balancing the competing interests involved, even in a short suspension, the Court determined that the procedures due to a student included notice, an explanation of the case against the student, and "an opportunity to present his side of the story." *Id.* at 581, 95 S.Ct. at 740. The Court cautioned, however, that "further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process." *Id.* at 583, 95 S.Ct. at 741.

In this case, there is no doubt that Gorman was given notice of the charges against him, and an opportunity to be heard. Nevertheless, he maintains that the University denied him certain procedural protections guaranteed by the due process clause of the Constitution. Specifically, Gorman contends that he was entitled to, and was deprived of: (1) an impartial and independent decision-maker, (2) a transcript and/or a tape recording of the hearings, (3) cross-examination of any participant in the actions concerning possible bias, (4) representation by counsel at the hearings, and (5) review of the University's decision by a court under a "substantial evidence" standard. In essence, Gorman's argument rests on the premise that a university may not discipline its students without providing full-scale adversarial proceedings comparable to those afforded defendants in a criminal trial.

■ In fostering and insuring the requirements of due process, however, the courts have not and should not require that a fair hearing is one that necessarily must follow the traditional common law adversarial method. Rather, on judicial review the question presented is whether, in the particular case, the individual has had an opportunity to answer, explain, and defend, and not whether the hearing mirrored a common law criminal trial.

■ Beyond the right to notice and hearing, the span of procedural protections required to ensure fairness becomes uncertain, and must be determined by a careful weighing or balancing of the competing interests implicated in the particular case. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The interests of students in completing their education, as well as avoiding unfair or mistaken exclusion from the educational environment, and the accompanying stigma are, of course, paramount. As the Supreme Court declared in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), "education is perhaps the most important function of state and local governments.... It is required in the performance of our most basic public responsibilities.... It is the very foundation of good citizenship." *Id.* at 493, 74 S.Ct. at 691.

Although the protection of such a vital interest would require all possible safeguards, it must be balanced against the need to promote and protect the primary function of institutions that exist to provide education. Although fairness in discipli-

nary procedures serves the goals of both students and schools alike, the burdens imposed on the schools may become unjustifiable. School administrators and courts recognize that "procedural requirements entail the expenditure of limited resources, [and] that at some point the benefit to individuals from an additional safeguard is substantially outweighed by the cost of providing such protection...." Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. at 1276. Hence, it is no exaggeration to state that the undue judicialization of an administrative hearing, particularly in an academic environment, may result in an improper allocation of resources, and prove counter-productive.

In this case, the district court noted that, an impartial and independent adjudicator "is a fundamental ingredient of procedural due process." *Gorman*, 646 F.Supp. at 810; *see Withrow v. Larkin*, 421 U.S. 35, 46–47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). Gorman maintains that this fundamental requisite was lacking in the disciplinary actions taken against him. The district court agreed, and found that the UBSC's independence was compromised by the extensive participation of Weisinger, and that the potential bias of the board members violated the requirements of due process. *See Gorman*, 646 F.Supp. at 810–13.

■ As required by the University Manual, the decision-maker in disciplinary actions is not an administrator of the University, but is the UBSC, composed of students and faculty. It would seem clear that the role of the board before whom the student appears is quasi-judicial, which presupposes the indispensable prerequisites of integrity and objectivity. Nevertheless, it has been noted that "[a]lleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences." *Duke v. North Texas State Univ.*, 469 F.2d 829, 834 (5th Cir.1972), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973). Generally, in examining administrative proceedings, the presumption favors the administrators, and the burden is upon the party challenging

the action to produce evidence sufficient to rebut this presumption.

■ Gorman has not met this burden of proof in this case. In the intimate setting of a college or university, prior contact between the participants is likely, and does not *per se* indicate bias or partiality. An examination of the record in this case reveals no evidence of bias or prejudice which would show that the board's independence was compromised to such an extent that the hearings were unfair and that due process was violated.

■ Nor do the various roles of Weisinger, while inappropriate in a judicial setting, necessarily violate the requirements of fairness. As Justice Blackmun noted in *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), "the advocate-judge-multiple-hat suggestion.... assumes too much and would bring down too many procedures designed, and working well...." *Id.* at 410, 91 S.Ct. at 1432. Gorman's contention that Weisinger's various roles or "multiple-hats" are evidence of bias and undue influence, also "assumes too much." The University procedures are designed to give students an opportunity to respond and defend against the charges made, and there is no evidence which would show that Gorman was denied a fair hearing because of Weisinger's multiple roles. Consequently, in this case, it cannot be said that Gorman has borne his burden of demonstrating that the UBSC's independence was compromised, and that it did not afford him a fair hearing.

■ The district court also held that Gorman's due process rights were violated by the University's denial of his request to tape record the hearings. Although the absence of a written transcript has not been a ground for reversing disciplinary action, several courts have required some form of record. *See, e.g., Marin v. University of Puerto Rico*, 377 F.Supp. 613, 623 (D.P.R.1974); *Esteban v. Central Missouri State College*, 277 F.Supp. 649, 652 (W.D. Mo.1967). Indeed, in this case, the University Manual, section 9.23.17, states that "[a] record of each hearing, comprised of a summary of the testimony and evidence

presented and of the decision rendered, shall be made." These written accounts of Gorman's hearings, made and maintained by the Office of Student Life, clearly constituted a sufficient record of the proceedings. Hence, we disagree that, in this case, the right to tape record the hearings was so essential that its denial rendered the hearing unfair, and was a violation of due process.

■■■■ The district court rejected Gorman's contention that he was deprived of his constitutional right to retain counsel, and to cross-examine his accusers on his allegations of bias. On these two allegations of error, we agree with the holding of the district court. As indicated in the district court's opinion, the weight of authority is against representation by counsel at disciplinary hearings, unless the student is also facing criminal charges stemming from the incident in question. *Gorman,* 646 F.Supp. at 806; *see Wasson v. Trowbridge,* 382 F.2d 807, 812 (2d Cir.1967); *Jaksa v. Regents of the Univ. of Michigan,* 597 F.Supp. 1245, 1252 (E.D.Mich.1984), *aff'd mem.,* 787 F.2d 590 (6th Cir.1986). This, however, does not preclude a student threatened with sanctions for misconduct from seeking legal advice before or after the hearings. Furthermore, as permitted by the University Manual, Gorman was allowed, and did in fact, choose someone from within the University community to assist him in presenting his case to the UBSC.

As for the right to cross-examination, suffice it to state that the right to unlimited cross-examination has not been deemed an essential requirement of due process in school disciplinary cases. *See Winnick v. Manning,* 460 F.2d 545, 549 (2d Cir.1972); *Dixon v. Alabama State Bd. of Educ.,* 294 F.2d 150, 159 (5th Cir.1961); *Jaksa v. Regents of the Univ. of Michigan,* 594 F.Supp. 1245, 1252–53 (E.D.Mich.1984). Gorman had the opportunity to cross-examine his accusers as to the incidents and events in question, and there is no evidence that any limitation on Gorman's cross-examination prevented him from eliciting the truth about the facts and events in issue.

Under the circumstances presented, Gorman was not deprived of procedural due process as a result of any limitation upon his right of cross-examination.

■■■ A major purpose of the administrative process, and the administrative hearing, is to avoid the formalistic adversary mode of procedure. As stated by Justice White in *Goss v. Lopez,* "further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process." 419 U.S. at 583, 95 S.Ct. at 740. Hence, on review, the courts ought not to extol form over substance, and impose on educational institutions all the procedural requirements of a common law criminal trial. The question presented is not whether the hearing was ideal, or whether its procedure could have been better. In all cases the inquiry is whether, under the particular circumstances presented, the hearing was fair, and accorded the individual the essential elements of due process. In the words of Justice White, "the Due Process Clause requires, not an 'elaborate hearing' before a neutral party, but simply 'an informal give-and-take between student and disciplinarian' which gives the student 'an opportunity to explain his version of the facts.' " *See Ingraham v. Wright,* 430 U.S. 651, 693, 97 S.Ct. 1401, 1423, 51 L.Ed.2d 711 (1977) (White, J., dissenting). A careful reading of the record in this case reveals that Gorman was given the opportunity to explain fully his version of the facts. In addition, Gorman had the opportunity to appeal the adverse decisions, and did in fact avail himself of the University's appeal process. Although the extensive hearings did not mirror common law trials, the hearings were fair and comported with requirements of due process.

### Conclusion

It is the holding of the court that the procedures employed in the disciplinary actions taken by the University of Rhode Island against Gorman did not violate the Due Process Clause of the fourteenth

amendment. The judgment of the district court is, therefore, affirmed in part and reversed in part.