Johnson v. Collins, et al.          CV-02-531-JM  12/04/02  P

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF NEW HAMPSHIRE**


Richard Johnson, et al.

    v.                                          Civil No. 02-531-JM
                                           Opinion No. 2002 DNH 211
Rodney C. Collins, et al.


## ORDER

Before the Court for consideration is the Plaintiffs' motion
for a preliminary injunction to order the School Board of the
Newmarket School District ("School Board") to readmit Andrew
Johnson as a student at the Newmarket Jr.-Sr. High School (the
"School").  The Plaintiffs, Richard and Maria Johnson (the
"Johnsons"), are the parents of Andrew Johnson ("Andrew").[1]  The
Johnsons allege that the School Board expelled Andrew on June 4,
2002 without due process for allegedly writing a bomb threat on a
school chalkboard on March 7, 2002.  The Johnsons further allege
that the School Board imposed unconstitutional conditions on
Andrew's readmission to school in late August 2002, and then

---

[1]Named as Defendants in this action are Rodney C. Collins,
individually and in his official capacity as Chief of Police of
the Town of Newmarket ("Chief Collins"), the School Board, Denis
Joy, in his official capacity as Superintendent of Schools for
the Newmarket School District (the "Superintendent"), and the
Town of Newmarket.

summarily expelled Andrew without due process on October 4, 2002 after he violated a school computer use policy.

After considering the testimony and other evidence presented at the hearing, and the relevant authorities, I find that the evidence supports the Johnsons' contention that Andrew was expelled on October 4, 2002 without due process in violation of the Fourteenth Amendment to the United States Constitution, and that he is likely to suffer ongoing irreparable harm absent injunctive relief. Accordingly, the Plaintiffs' motion for interim injunctive relief is granted.

<u>STANDARD OF REVIEW</u>

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." <u>CMM Cable Rep., Inc. v. Ocean Coast Prop., Inc.</u>, 48 F.3d 618, 620 (1st Cir. 1995) (citing <u>Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.</u>, 840 F.2d 701, 704 (9th Cir. 1988); <u>Am. Hosp. Ass'n v. Harris</u>, 625 F.2d 1328, 1330 (7th Cir. 1980)). Thus, if the court ultimately finds for the movant, a preliminary injunction provides the court with a method for preventing or minimizing any current or future wrongs caused

2

by the defendant.  CMM Cable Rep., 48 F.3d at 620.

A district court may grant a plaintiff's request for a preliminary injunction if the plaintiff can satisfy a four-part test: (1) the plaintiff will suffer irreparable harm if the injunction is not granted; (2) the plaintiff is likely to succeed on the merits; (3) the injury to the plaintiff outweighs any harm which granting the injunction would inflict on the defendant; and (4) the public interest will not be adversely affected by the granting of the injunction.  See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991); Planned Parenthood League of Mass. v. Belotti, 641 F.2d 1006, 1009 (1st Cir. 1981).  A party seeking injunctive relief must independently satisfy each of the preliminary injunction factors.  Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1981); Mass. Coalition of Citizens with Disabilities v. Civil Def. Agency & Off. of Emergency Preparedness of Com. of Mass., 649 F.2d 71, 74 (1st Cir. 1981).  In the First Circuit, the key issue in determining whether injunctive relief should be granted is whether the plaintiff can demonstrate a likelihood of success on the merits.  See Philip Morris, Inc. v. Harshbarger, 159 F.3d

670, 674 (1st Cir. 1998); <u>Ross-Simons of Warwick</u>, 102 F.3d 12, 16 (1st Cir. 1996); <u>Weaver v. Henderson</u>, 984 F.2d 11, 12 (1st Cir. 1993). With this standard of review in mind, the relevant facts are discussed below.

BACKGROUND

I. <u>School and Town Officials Respond to Bomb Threat</u>

On the afternoon of March 7, 2002, a bomb threat was written on a chalkboard in a classroom at the School. The note stated: "This ones for real. There is a bomb that will explode between 9 am and 1 pm. Have a nice life." The bomb threat was discovered on the morning of March 8, 2002. The police were notified, the building was evacuated, and the building was searched. The threat led to the disruption of the entire school day. The high school students were dismissed for the day. The junior high school students were sent to other schools.

The police did not find a bomb. However, the investigation revealed that the classroom where the bomb threat was written had been vandalized. Computer cables were cut, a utility panel on a wall was ripped out, and the face cover to an emergency light panel outside the room was removed. The chalkboard where the bomb threat was written, a piece of chalk, and an eraser were

4

seized from the School as evidence of the crime.

The police investigation of the incident eventually revealed that Andrew and two other students were seen wandering in the school hallways during the approximate time that the bomb threat was written on March 7th, and had reportedly left the building at 4:30 p.m.  On March 14, 2002, an employee in the Superintendent's office received an anonymous telephone call implicating Andrew in the bomb threat.

In an affidavit dated March 14, 2002 submitted to the Rockingham County Superior Court, Chief Collins stated that he had been informed by a Newmarket police detective that the State Laboratory had confirmed that identifiable fingerprints were found on the chalkboard.  Pl. Ex. 19.  The detective also indicated that the State Laboratory determined that the prints that were found were likely to have been by the person who wrote the bomb threat.  Id.  The court issued a search warrant requiring Andrew to submit to fingerprinting by the police.  The Newmarket police executed the warrant after interviewing Andrew on March 15, 2002.

The State Laboratory's subsequent comparison of the fingerprint impressions that were obtained from the evidence and

5

Andrew's fingerprints revealed no matches.  Pl. Ex. 17.  The Newmarket Police did not submit fingerprint impressions from either of the two other students implicated in the incident for comparison with fingerprint impressions obtained from the evidence.  Nor was any handwriting analysis ever performed to compare the handwriting in the bomb threat with handwriting exemplars of Andrew and two other students implicated in the incident.

On April 28, 2002, Chief Collins obtained an arrest warrant for Andrew "[f]or the crime of false reports as to explosives and criminal mischief (RSA 158:38)."  Andrew was arrested and taken into police custody, while he was at school, on April 29, 2002.  The School suspended Andrew that same day.

## II. June 4, 2002 Expulsion

The Johnsons received written notice of the School Board's charge against Andrew of writing a bomb threat by letter dated May 20, 2002.  Def. Ex. B.  The Superintendent indicated in the notice that the Johnsons had the right to have hearing before the School Board deliberated "on whether or not to expel Andrew for the rest of the school year . . . ."  Id.  The School Board held a hearing regarding the incident on June 4, 2002.  Def. Ex. C.

6

By letter dated June 6, 2002, the Superintendent sent a letter to the Johnsons informing them of the School Board's decision to expel Andrew. See Pl. Ex. 1. The Superintendent wrote in pertinent part:

> This is to formally notify you that at a duly posted hearing held on Tuesday, June 4, 2002, the Newmarket School Board voted to expel your son, Andrew, for the remainder of the school year. You may apply to the School Board this summer for permission to re-enroll in school beginning August of 2002.
>
> The School Board's decision was that Andrew did commit an act of "gross misconduct" for which the Board may expel a student under RSA 193:13 II. The gross misconduct being, the act of writing a bomb threat on a chalkboard at Newmarket Jr.-Sr. High School on Thursday, March 7, 2002, which was discovered on Friday, March 8, 2002.
>
> Testimony given by the Newmarket Police Department and the Newmarket Jr.-Sr. High School Principal were the factors upon which the decision was based.

Pl. Ex. 1.

III. Readmission to the Newmarket Jr.-Sr. High School

A. Proceedings in the Family Court

After Andrew was arrested, he was criminally charged with filing a false report of an explosive device and with criminal mischief. By that time, the Johnsons were aware of the results of the fingerprint examination performed by the State Laboratory. The Johnsons urged the School and the Superintendent to readmit

7

Andrew.  Maria Johnson testified that the Superintendent told her that if Andrew was acquitted at trial he would be "morally obligated to make things right."

On July 22, 2002, an adjudicatory hearing was held at Brentwood Family Court.  After hearing the evidence submitted, the court found that the State did not prove its case against Andrew for writing a bomb threat beyond a reasonable doubt.  In its written decision, the court found that "the State failed to prove an element of the offense -- anxiety[,] etc. to any person."  Def. Ex. A.  While the court granted Andrew a directed verdict on the bomb threat charge, it never determined whether the allegation against him was true.  Moreover, it is not possible to determine based on the record whether or not the court would have found Andrew responsible for the bomb threat had the court been forced to determine the merits of the allegation. The court did find with respect to the matters which were not the basis of the expulsion that "the State did prove beyond a reasonable doubt that the juvenile committed the offense of criminal mischief (02-J-105) as charged."  Id.

B.   Johnsons' Attempt to Have the Expulsion Nullified

After the proceedings in the family court concluded, the

8

Johnsons attempted to convince the School Board to nullify Andrew's expulsion. On August 15, 2002, the School Board formally voted against expunging the expulsion and notified the Johnsons of that decision. Def. Ex. D. The School Board further decided to require Andrew "to undergo a complete psychological examination by an independent evaluator to determine, among other things, whether the student is a potential danger . . . and is emotionally prepared to return to school." Id.

By letter dated August 22, 2002, the Superintendent sent the Johnsons a confirmatory letter indicating that the School voted unanimously not to reconsider Andrew's expulsion and had agreed to delay consideration of the Johnsons' request to have Andrew return to school. Def. Ex. E. The August 22nd letter also discussed the School Board's decision to require Andrew to undergo a psychological examination prior to being permitted to return to school. Id.

C.   School Board Decides to Readmit Andrew

The Johnsons agreed to have Andrew undergo a psychological examination before the School Board would consider whether to readmit him. After the examination, Andrew was found to be a low-risk for any future misconduct.

On August 27, 2002, after the new school year had begun, the School Board held a special emergency meeting to consider whether to permit Andrew to return to school. Def. Ex. F. The School Board voted to allow Andrew to return to school pending the acceptance by Andrew and the Johnsons of stipulations drafted by the School Board. Among those stipulations was a provision that "[i]f the student commits any offense for which suspension from school is the punishment, reinstatement of the expulsion will occur." Pl. Ex. 5. Richard Johnson testified that he and Andrew signed the agreement because they were desperate to get Andrew back into school. Maria Johnson refused to sign the agreement because she found the stipulations offensive. A letter agreement containing the stipulations was signed by Richard Johnson, Andrew and the Superintendent on August 28, 2002. Id. Andrew was readmitted on August 29, 2002.

IV. October 4, 2002 Suspension And Expulsion

A. Violation of Computer Use Policy

The undisputed evidence showed that Andrew attended classes without incident until October 4, 2002. On that date, Andrew was suspended for violating a computer use policy at the Seacoast School of Technology where Andrew was taking courses in

10

collaboration with the Newmarket Jr.-Sr. High School.  Andrew
admitted to seeing a demonstration of a prohibited file on
another student's computer and then requesting that the other
student provide him a copy.  Andrew then saved the file to the
network.  Def. Ex. G.  Both Andrew and the student who provided
him with the file were suspended from school for one full day.
Because Andrew took courses at the Seacoast School of Technology
in collaboration with the Newmarket Jr.-Sr. High School, Andrew
was simultaneously suspended from his courses at the Newmarket
Jr.-Sr. High School for the day.  Pl. Ex. 8.

B.    Summary Expulsion

By letter dated October 4, 2002, the Superintendent informed
the Johnsons that:

> In accordance with the agreement signed on August 28,
> 2002, because Andrew has been suspended from school,
> the Newmarket School Board has reinstated Andrew's
> expulsion from school effective this date.
>
> Andrew was suspended from school for violating the
> computer use policy at the Seacoast School of
> Technology, thus he has violated item number three of
> the agreement.

Pl. Ex. 6.  Andrew was not afforded a hearing before the
expulsion took effect.  By separate letter dated October 4, 2002,
the Superintendent informed the Johnsons that the School Board's

11

August 15, 2002 decision not to reconsider Andrew's expulsion was final and that the School Board would not participate in any further discussion related to reconsidering or reversing the expulsion.  Pl. Ex. 7.

DISCUSSION

I.   Likelihood of Success on the Merits

   A.   Section 1983 Claims

Section 1983 creates a cause of action against those who, acting under color of state law, deprive individuals of "any rights, privileges or immunities secured by the Constitution and laws" of the United States.  See 42 U.S.C. § 1983; Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327 (1986); Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997).  In order to be held liable for a violation under § 1983, a defendant's conduct must have been a cause in fact of the alleged deprivation.  See Monell v. Dep't of Soc. Serv., 436 U.S. 658, 692 (1978); Soto v. Flores, 103 F.3d 1056, 1061-62 (1st Cir. 1997).

The premise of the Johnson's § 1983 claim is that the defendants, acting under color of state law, wrongfully expelled Andrew and thereby denied him a liberty interest in a free public

12

education.  Although the Johnsons have appealed the School Board's decision with respect to the June 4th expulsion to the State Board of Education, they need not exhaust their administrative remedies before bringing an action in federal court under § 1983.  See e.g., Parker v. Grand Hyatt Hotel, 124 F. Supp. 2d 79, 86 (D.D.C. 2000); Cook v. Edwards, 341 F. Supp. 307, 310 (D.N.H. 1972).

B. Due Process Claims

States are not obligated under the United States Constitution to maintain a public school system.  Goss v. Lopez, 419 U.S. 565, 574 (1975); San Antonio Indep. School Dist. v. Rodriguez, 411 U.S. 1, 35 (1973).  But when a state elects to provide free education to all youths, as in New Hampshire, the state is "constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause."  Goss, 419 U.S. at 574.  Thus, while the states possess the authority to prescribe and enforce standards of conduct in schools, that authority must be exercised consistent with constitutional safeguards.  Id.

13

In Goss, the Supreme Court established standards that school boards must follow to meet the requirements of the Due Process Clause in connection with short-term suspensions of ten days or less. The Court stated, "[a]t the very minimum, . . ., students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." Goss, 419 U.S. at 579. The Court further clarified that students must "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Id. at 581. The reason for these prerequisites is that the Due Process Clause "requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school." Id.

The Supreme Court expressly stated in Goss that it only addressed the due process requirements for short suspensions that do not exceed 10 days. 419 U.S. at 584. The Court stated that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." Id. The Supreme Court has never addressed the specific due

14

process requirements of long-term suspensions and expulsions.

The First Circuit recognized in Gorman v. Univ. of Rhode Island, 837 F.2d 7, 13 (1st Cir. 1988), that the federal courts have uniformly held in student discipline cases that "fair process requires notice and an opportunity to be heard before the expulsion or significant suspension of a student from a public school."  Courts have not, however, required that a school disciplinary hearing resemble a traditional common law trial in order to be deemed fair.  Id. at 14.  "Rather, on judicial review the question presented is whether, in the particular case, the individual has had an opportunity to answer, explain, and defend, and not whether the hearing mirrored a common law criminal trial."  Id.  Determining the extent of procedural protections that are due requires the court to weigh the student's interest in completing his education against the state's interest in preserving its limited resources for its primary function of providing education.  See id., citing Matthews v. Eldridge, 424 U.S. 319, 334-35 (1976).

In Carey on Behalf of Carey v. Maine School Administrative District #17, 754 F. Supp. 906, 919 (D. Maine 1990), the district court enumerated seven minimum requirements that must be observed

15

in student disciplinary hearings in order to assure the requisite balance between the substantial interests of the student and the state:

(1) The student must be advised of the charges against him;

(2) the student must be informed of the nature of the evidence against him;

(3) the student must be given an opportunity to be heard in his own defense;

(4) the student must not be punished except on the basis of substantial evidence;

(5) the student must be permitted the assistance of a lawyer in major disciplinary hearings;

(6) the student must be permitted to confront and to cross-examine the witnesses against him; and

(7) the student has the right to an impartial tribunal.

Carey, 754 F. Supp. at 919, quoting Keene v. Rodgers, 316 F. Supp. 217, 221 (D. Me. 1970). I am persuaded that these seven requirements strike the appropriate balance between the competing interests of the parties in this case.

For the reasons that I address herein, I find that the Johnsons are likely to succeed on the merits of their due process claim for the following reasons: (1) the School Board's notice of its intended action in response to the bomb threat charge was

16

inadequate; (2) the June 4, 2002 hearing on the bomb threat charge provided the Johnsons with no meaningful opportunity to cross-examine the witnesses against Andrew; and (3) the School Board summarily expelled Andrew on October 4, 2002 without affording him a hearing.

1. <u>Lack of Adequate Notice</u>

From the evidence presented at the injunction hearing, I find that the Johnsons are likely to show that the School Board did not provide adequate notice that the School Board sought to permanently expel Andrew from the School on June 4, 2002. In the notice of charges sent by the Superintendent, the Johnsons were informed that the School Board would deliberate whether to expel Andrew for the remainder of the school year. <u>See</u> Def. Ex. B. The Superintendent also informed the Johnsons that Andrew had been expelled for the remainder of the school year in the School Board's written decision. <u>See</u> Pl. Ex. 1. The testimony at the injunction hearing showed that less than three weeks of school remained in the school year when the School Board made its decision.

In response to the instant motion for a preliminary injunction, the School Board contends that the June 4, 2002

expulsion was actually a permanent denial of Andrew's right to attend school.[2]  I find that the notice that Andrew was expelled "for the remainder of the school year" could reasonably have affected the Johnsons' decision whether to be represented by counsel at that hearing, and the Johnsons' decision whether to immediately appeal the School Board's decision.

2.  <u>Denial of Right to Cross-Examine Witnesses</u>

I find that the hearing on the June 4, 2002 expulsion was constitutionally deficient because the Johnsons were not

---

[2]The relevant New Hampshire statute, RSA 193:13, does not define the term "expulsion."  The Board of Education's Administrative Rules with respect expulsions are contradictory.  N.H. Code Admin. R. Ed. 317.02(a) defines the term "expulsion" to mean: "the permanent denial of a pupil's attendance at school for any of the reasons listed in RSA 193:13, II and III.  But the disciplinary procedures categorize expulsion as a "level of discipline" that shall be "for a period determined in writing by the board . . . ."  N.H. Code Admin. R. Ed. 317.04(a)(3); <u>see also</u>, N.H. Code Admin. R. Ed. 317.04(i) ("The decision shall state whether the student is expelled and the length of the expulsion."), and N.H. Code Admin. R. Ed. 317.04(j) ("A statement of the time period for which the student is expelled and any action the student may take to be restored by the board).  The regulations clearly provide that a school board must indicate the time period of any expulsion.  Regardless of the School Board's intent, the School Board did, in fact, notify the Johnsons that Andrew was suspended for a period of time, namely, for the rest of the school year.  For the purposes of this Order, I find that the School Board's notice of its contemplated action, and its letter of June 6, 2002 informing the Johnsons of its decision, did not provide adequate notice that the School Board sought to permanently deny Andrew the right to attend school.

18

permitted to cross-examine the witnesses against Andrew at the hearing on the initial expulsion. Although the right to examine witnesses need not have been in compliance with the rules of evidence, and unlimited cross-examination is not an essential requirement of due process in school disciplinary cases,[3] the School Board's hearing deprived the Johnsons of <u>any</u> meaningful opportunity to defend against the charges against Andrew.

The School Board stated in its written decision that the factors upon which the decision was based was the testimony given by the Newmarket Police Department and the Newmarket Jr-Sr. High School Principal. The evidence at the injunction hearing showed that the testimony that the school board relied upon denied the Johnsons any opportunity to cross-examine the witnesses against them.

The Superintendent testified at the injunction hearing that Captain Cyr, a Newmarket Police Officer, testified at the hearing on behalf of the Newmarket Police Department. Captain Cyr informed the School Board what other students, implicated in the crime, told the police during interviews. This was hearsay testimony that deprived the School Board of any opportunity to

---

[3]<u>Gorman</u>, 837 F.2d at 16.

19

consider the credibility of the student's testimony for themselves. It is also obvious that the School Board was far more likely to credit these statements when relayed from a police officer as opposed to if the students were required to give live testimony. Not only was the police officer's testimony merely hearsay, however, from the evidence at the injunction hearing it became apparent that Captain Cyr was not even present at the interviews of the other students.[4] That made Captain Cyr's testimony double hearsay. He was only able to testify as to what he learned from other officers about what the witnesses said and he did not himself have an opportunity to weigh the credibility of the witnesses while they gave their statements.

Even more significantly, the students who gave the statements to the police were themselves implicated in the alleged crimes and were given immunity in exchange for their testimony against Andrew. In particular, the other students most likely to have been the author of the bomb threat had an obvious motive to divert attention away from themselves and onto Andrew.

---

[4]The Court has reviewed the transcript of the adjudicatory proceedings in the Brentwood Family Court. Captain Cyr, the officer who testified before the School Board on June 4, 2002, is never mentioned as having been present at the police interviews of the other two students implicated in the incident.

In addition to Captain Cyr's double hearsay testimony, Deborah Brooks, the School Principal, was not even present during the hearing. She was permitted to submit tape-recorded comments, which gave the Johnsons absolutely no opportunity for cross-examination.

In the instant case, the deprivation of a meaningful right to cross-examination witnesses is plainly apparent based on the evidence presented at the injunction hearing. Accordingly, I find that the Johnsons are likely to succeed on the merits of their claim that they were deprived of due process because they were not permitted a fair opportunity to challenge the validity and weight of the evidence against Andrew. This deprivation likely violated the Due Process Clause of the Fourteenth Amendment and a specific Administrative Rule of the New Hampshire Board of Education which provides that "[d]uring the hearing, the pupil, parent, guardian, or counsel representing the pupil, shall have the right to examine any and all witnesses." N.H. Code Admin. R. Ed. 317.04(d)(3)(g)(5).

3. <u>Expulsion Without a Hearing</u>

The School Board's decision to summarily expel Andrew on October 4, 2002 likely violated his constitutional right to due

process in that he was not afforded any hearing prior to the expulsion. The summary expulsion was also contrary to the N.H. Code Admin. R. Ed. 317.04(d)(3)(a), which provides that a formal hearing shall be held before any expulsion.

The School Board argues that the letter agreement containing stipulations for Andrew's readmission to School provided adequate justification for expelling Andrew without a hearing. The terms of the stipulation provide, however, that "[i]f the student commits any offense for which suspension from school is the punishment, reinstatement of the expulsion will occur." Pl. Ex. 5.

I find the School Board's argument unpersuasive for three reasons. First, I have already determined that the Johnsons are likely to succeed on the merits of their claim that the June 4, 2002 hearing was constitutionally deficient. Second, the stipulation is ineffectual as a basis for reinstating the June 4, 2002 expulsion in October 2002 because by the express terms of the School Board's written decision the June 4th expulsion was for the remainder of the previous school year, which ended in June 2002. The School Board could not reinstate an expulsion that already expired. Third, even if the stipulation were valid,

22

it contains no express waiver of Andrew's right under the United States Constitution, and the New Hampshire Board of Education's Administrative Regulations (N.H. Code Admin. R. Ed. 317.04(d)(3)(a)) to have a hearing before the expulsion would take effect.

For the purposes of the Johnsons' motion for a preliminary injunction, I find that the Johnsons have demonstrated a significant likelihood of success on the merits of their claim that Andrew was deprived of a liberty and property interest in his right to attend a free public school without due process of law.[5]

---

[5]The Johnsons further allege that Andrew was deprived of an impartial and independent decision-maker because the School Board was intimidated by Chief Collins. Evidence was presented at the injunction hearing suggesting that the Chief Collins was angered because the School Board considered significantly cutting back or entirely eliminating funding for a student resource officer in January 2002. Pl. Ex. 16. At the time, Richard Johnson was the Chair of the School Board. An unidentified individual warned the Superintendent to drive carefully in Newmarket because the police "were watching" and looking for an opportunity to retaliate. Id. The student resource officer was retained in the budget. Because I find that the Johnsons are likely to establish that Andrew's due process rights were violated for the reasons previously stated, I do not consider the merits of the bias allegation here. I also note that since the motion for preliminary injunction did not involve Defendant Collins his evidence had neither been heard nor considered.

II.  Irreparable Harm

In order to be entitled to a preliminary injunction, the Johnsons must demonstrate that Andrew is likely to suffer irreparable harm absent relief.  Irreparable harm is a substantial injury that is not accurately measurable or adequately compensable by money damages.  Ross-Simons of Warwick, 102 F.3d at 18-19; Auburn News Co., supra, 659 F.2d at 277; Sierra Club v. Larson, 769 F. Supp. 420, 422 (D. Mass. 1991).  "To establish irreparable harm there must be an actual, viable, presently existing threat of serious harm."  Sierra Club, 769 F. Supp. at 422 (citing Massachusetts Coalition, supra, 649 F.2d at 74).

The value of a free public education is beyond dispute.  The United States Supreme Court stated in Brown v. Board of Education, 347 U.S. 483 (1954), that "education is perhaps the most important function of state and local governments . . . . It is required in the performance of our most basic public responsibilities . . . . it is the very foundation of good citizenship."  Id. at 493.  I find that the Johnsons have made an adequate showing that Andrew is likely to suffer irreparable harm absent injunctive relief if he continues to be deprived of an

24

education during the pendency of this lawsuit.

The evidence shows that Andrew was not given credit for completion of the 10th grade following his expulsion on June 4, 2002. While Andrew was conditionally readmitted on August 29, 2002, he was summarily expelled on October 4, 2002, and has not participated in any classes since through the date of the preliminary injunction hearing, held on December 2, 2002. The standard track for a trial on the merits in this Court is one year, which means that it is reasonable to expect that a final decision in this matter would not be reached until months after the beginning of the next school year. With each passing school year, the amount of time left for Andrew to complete a free public education before attaining 21 years of age diminishes. By statute, the right to a free public education in New Hampshire expires after a student reaches 21 years of age. See N.H. RSA 193:1-c, I (the right of access to public school programs does not extend to any pupil who has attained the age of 21). The loss of Andrew's right to a free public education, and its likely impact on his future opportunities, is not accurately measurable or adequately compensable by money damages.

### III. Balance of the Hardships

I must next consider the balance of the hardships to the parties in granting an injunction. The Court is mindful that the School Board was grappling with a difficult issue in determining how to respond to the bomb threat, and that the School Board claims that it acted in good faith to enforce school rules. I find, however, that the balance of the hardships weighs in favor of the Plaintiffs. The relative cost to Andrew in terms of his additional loss of time in school outweighs the Defendants' interest in continuing Andrew's expulsion during the pendency of this litigation, particularly in light of the Plaintiffs' showing of likelihood of success on the merits.

### IV. Affect on the Public Interest

The School Board argues that the granting of an injunction will impair the school's ability to enforce its rules through fair disciplinary action. The School Board also argues that it relied in good faith on the investigation of the Newmarket Police Department in reaching its conclusion that Andrew was responsible for the bomb threat. In contrast, the Johnsons contend that the public interest weighs in favor of requiring the Newmarket School District to afford students due process prior to depriving them

of a liberty and property interest in a free public education.

I find that the public interest will not be adversely affected by the granting of an injunction. In making my determination I find it significant that the School Board made no showing that Andrew poses a danger to the students or staff at the School.

CONCLUSION

For the reasons set forth above, the Plaintiffs' request for a preliminary injunction seeking an order requiring the School Board of the Newmarket School District to readmit Andrew to the Newmarket Jr.-Sr. High School is granted.

**It is hereby ordered** that pending a decision on the merits of this action, or further order of this Court, Andrew Johnson shall be readmitted to the Newmarket Jr.-Sr. High School commencing on Monday, December 9, 2002. The Defendants, and their officers, agents, servants, employees, and attorneys, and any person acting in concert with them who receive actual notice of this Order, are enjoined from directly or indirectly preventing Andrew Johnson from attending classes at the Newmarket Jr.-Sr. High School based either in whole, or in part, on the School Board's June 4, 2002 expulsion decision.

The School Board and the School are further ordered to make such accommodation as is necessary to enable Andrew to complete the 10th grade, and to get caught up in his course work for this semester.

_____
James R. Muirhead
United States Magistrate Judge

Date:   December 4, 2002

cc:   Paul McEachern, Esq.
      Gordon B. Graham, Esq.

28